1996 SD 61

**CONTINENTAL GRAIN COMPANY, Plaintiff and Appellee,**

v.

**HERITAGE BANK, Defendant and Appellant,**

and

Margery Brandenburg, Western Cattle, Inc., Louis J. Welte, and Western Video Cattle, Inc., Defendants.

**CONTINENTAL GRAIN COMPANY, Plaintiff and Appellee,**

v.

**SHASTA LIVESTOCK AUCTION YARD, d/b/a Western Video Cattle, Inc., Defendant and Appellant,**

and

Margery Brandenburg, Western Cattle, Inc., Louis J. Welte, and Heritage Bank, Defendants.

**Nos. 19321, 19323.**

Supreme Court of South Dakota.

Argued March 11, 1996.

Decided May 22, 1996.

Rehearing Denied June 26, 1996.

Dennis H. Hill of Costello, Porter, Hill, Heisterkamp & Bushnell, Rapid City, and David L. LeBas of Gibson, Ochsner & Adkins, Amarillo, Texas, for appellee.

Mark F. Marshall of Johnson, Heidepriem, Miner & Marlow, Sioux Falls, for appellant bank.

Robert M. Nash of Wilson, Olson, Nash & Becker, Rapid City, for appellant Western Video Cattle, Inc.

SABERS, Justice

[¶ 1] Shasta Livestock Auction Yard, Inc. (Shasta) and Heritage Bank appeal a summary judgment in favor of Continental Grain Company. We reverse and remand because genuine issues of material fact exist.

## FACTS

[¶ 2] This is a consolidation by the trial court of three lawsuits brought by Continental, Heritage Bank, and Shasta. The following appear to be the facts based on the present record and the briefs.

[¶ 3] Bud Brandenburg is a cattle order buyer. His purchases were financed by Louis Welte, through Heritage Bank.[1] Welte authorized Bud to sign checks on Welte's account. In the normal course of business, Bud would purchase cattle by writing a check on Welte's account to the seller. The cattle were then sold to a third party and proceeds from the sale were used to repay Welte. In return for the use of his money, Bud paid a commission or interest to Welte.

[¶ 4] Western Cattle, Inc., a cattle buying corporation, is owned by Bud's wife, Margery Brandenburg and her daughter. Margery had an agreement with Continental wherein Continental would lend money on cattle delivered to its Fall River Feedlot in Hot Springs, South Dakota, and would charge her interest on the loan as well as for feed and costs. Margery, individually, signed a security agreement with Continental in October 1991 and a financing statement for livestock she placed "on feed" at the Fall River Feedlot in 1994. The security agreement contained an after-acquired property clause. Generally, Continental would lend money by sending a check to Margery when a load of cattle arrived. The check was made out to Margery or to Western Cattle, Inc. Continental sent a promissory note for Margery's signature once the cattle had been sorted and placed on the lot. Continental fed the cattle until they were ready and then sold them, usually to a packer. At that time, Continental would pay off its loan and its bill for feed and costs and forward any profits.[2]

[¶ 5] In April 1994, Bud Brandenburg purchased 650 heifers from Shasta's video auction, which were branded with a hoof print on the right rib. Shasta purchased the cattle from Jack Sparrowk for sale at its auction. Shasta gave Bud a receipt which indicated he was the buyer of the cattle. Two checks were written to Shasta to pay for the cattle. One check was written by Western Cattle, Inc. and signed by Margery Brandenburg. This check was returned for nonsufficient funds. The other check was written by Bud

1. Welte is an order buyer and allowed Bud and several other buyers to purchase cattle and write checks on his account. According to bank officers, the practice of order buying would have Welte holding cattle for a brief period of time, between ten and twenty days, in which time the cattle would be purchased, transferred to a new owner, and the checks collected and cleared.

Welte was not optimistic about the cattle market and did not want to own any cattle in 1994, so he authorized only transactions where he or one of his agents already had a buyer and were buying for a third party.

2. Clayton Lambeth, general manager of the Fall River Feedlot, testified as follows regarding the arrangement with Margery:

   Q: How did Margery Brandenburg make payments to Continental on any cattle that she had purchased and placed at the feedlot[?]
   A: She didn't make any payments to Continental Grain or Fall River Feedlot. The mechanics of the way it worked was, . . . a particular bunch of cattle cost $650 per head delivered to our facilities with the . . . cost of the cattle and the freight and all the cost. We would advance the $650, less the down payment of $150, so her contribution to the package is $150. Then we would advance the $500, which would be the differential, so she never wrote us any checks.
   Q: . . . How did Continental get paid?
   A: Continental got paid actually when the cattle went out of our facilities to the packers when we received those proceeds. What we do at that point is if the cattle broke even, then she would get her $150. If the cattle made more than $150, she'd get more than that. If they lost some of the $150, she would get less. . . .
   Q: . . . She wouldn't actually get a check back until the cattle had been sold and Continental had been paid?
   A: That's correct.

on Welte's account. Welte or his bank, Heritage Bank, stopped payment on that check.

[¶ 6] The cattle were shipped to Continental's Fall River Feedlot. A California brand inspection certification identified Bud as the consignor, or shipper, of the cattle. A South Dakota brand inspector's tally identified Bud as the "owner of the brand." Bud called and told Continental the cattle would be placed on its feedlot for Margery. Continental loaned Western Cattle, Inc., not Margery, $252,437.17 on the cattle on May 2, 1994. A promissory note was prepared and sent to Margery by Continental, but on the advice of counsel she did not sign it.

[¶ 7] After Shasta discovered the checks did not clear the banks, its employees called the Fall River Feedlot and requested that the cattle be returned. Continental refused to return the cattle, claiming it had a security interest from Margery.

. [¶ 8] On May 18, 1994, Continental filed a declaratory judgment action. According to the complaint, Continental held approximately 1500 cattle for the Brandenburgs at that time. Continental requested the trial court declare its security interest in the 1500 cattle valid and enforceable and declare that Continental could sell the cattle. Continental also requested the trial court determine that its security interest had priority over the security interests of Shasta, Welte, and Heritage Bank. Heritage Bank filed a declaratory judgment action.[3] On June 15, 1994, Shasta counterclaimed for rescission of its contract with Bud Brandenburg and for a declaratory judgment that Margery never owned any interest in the livestock. The trial court consolidated the lawsuits on October 6, 1994.

[¶ 9] Continental held the cattle and sold them in the fall of 1994. Continental paid itself $252,437.17 for the loan to Western Cattle, plus additional sums for feed, care, trucking, and interest. Approximately $80,-000 remained as a credit on Margery's account after the sales.[4]

[¶ 10] Continental, Shasta and Heritage Bank filed motions for summary judgment. The trial court's order indicates there was a hearing on the motions on May 22, 1995. The transcript of that hearing is not in the record. The trial court granted summary judgment in favor of Continental and found its security interest had priority over the security interests of Heritage Bank and Shasta, if they existed. The trial court held Continental's security interest was perfected February 22, 1994, and that Heritage Bank's security interest in proceeds was perfected May 29, 1994. Because Shasta merely reserved title until it received payment, the trial court held Shasta's security interest in the proceeds was unperfected.

[¶ 11] Continental applied to the trial court for payment of its attorney fees of approximately $96,000. The trial court allowed the attorney fees against Margery Brandenburg and permitted Continental to apply the $80,-

---

**3.** Heritage Bank claims a security interest in cattle which Margery placed at the Fall River Feedlot, but not the 650 cattle claimed by Shasta in this case. Heritage Bank admits it or Welte stopped payment on the Shasta check and therefore claims no interest in the 650 cattle. Heritage Bank bases its security interest in cattle on security agreements from Welte dated May 29, 1991 and May 12, 1994, a loan agreement dated March 22, 1994, a promissory note dated May 12, 1994, and financing statements filed with the South Dakota Secretary of State on May 13, 1994. The security agreement pledges, among other things, a purchase money security interest in "865 hd cattle located at Fall River Feedlot." There is no evidence of a security agreement between Welte and Bud, Margery, or Western Cattle, Inc.

Bud answered Heritage Bank's original complaint by signing a handwritten answer, filed April 12, 1995, which stated in part: "All monies from Weltes Heritage Bank & or Continental

Grain Co. were used for Cattle Purchases, Commodity Cattle Contracts, Hedging & or Speculating for the benefit of the Welte & Brandenburg Cattle trading & cattle feeding venture." This appears to be the only reference in the record that Bud was a party to these lawsuits.

**4.** The records of the Fall River Feedlot and the trial court's amended judgment indicate that on May 15, 1994, Margery had an account balance of $824,259.12. On October 15, 1994, after the addition of charges and interest, the account total was $1,177,700.54. Continental sold cattle on June 30, July 15, July 31, August 31, September 15, September 30, October 15, and October 31, 1994, for a total of $1,258,779.41. This resulted in a credit on Margery's account of $81,078.87. Whether the balance and the sales involved other cattle is not addressed by the parties.

000 balance from Margery's account on its attorney fees.

[¶ 12] Shasta and Heritage Bank appeal on the basis that the branding laws control, that Margery had no interest in the collateral, and that there was no showing the attorney fees were warranted or reasonable.

[¶ 13] **Whether genuine issues of material fact exist preventing summary judgment.**

[¶ 14] The standard of review on a motion for summary judgment is well settled. In reviewing a grant of summary judgment:

> " '[W]e must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the non-moving party and reasonable doubts should be resolved against the moving party. The non-moving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.' "

*BankWest v. Groseclose*, 535 N.W.2d 860, 863 (S.D.1995) (quoting *Easson v. Wagner*, 501 N.W.2d 348, 350 (S.D.1993); *Waddell v. Dewey County Bank*, 471 N.W.2d 591, 593 (S.D. 1991)). In this case, all parties moved for summary judgment. We look to the record before the trial court to determine whether genuine issues of material fact exist.

[¶ 15] The trial court, without a trial and without findings of fact, found Margery had sufficient rights in the cattle for Continental's security interest to attach. We have held that findings of fact are not required when there are no genuine issues of material fact.

> "Since summary judgment presupposes there is no genuine issue of fact, findings of fact and conclusions of law are unnecessary." *Wilson [v. Great N. Ry. Co.]*, 83 S.D. [207,] 211, 157 N.W.2d [19,] 21 [ (S.D. 1968) ].... "We are not bound by the

factual findings of the trial court and must conduct an independent review of the record," *Koeniguer v. Eckrich*, 422 N.W.2d 600, 601 (S.D.1988) (citation omitted).

*Piner v. Jensen*, 519 N.W.2d 337, 339 (S.D. 1994).

[¶ 16] We have reviewed the record and have determined that genuine issues of material fact exist. They include whether Margery had an interest in the cattle purchased from Shasta, who owned or had interests in the other cattle processed through Fall River, and whether Continental's attorney fees were allowable, and if so, reasonable. These questions appear to rest, at least in part, on the credibility of witnesses, which must be determined by the fact finder. *In re Estate of Elliott*, 537 N.W.2d 660, 662 (S.D.1995). These questions may also depend on documents not presently in the record.

[¶ 17] "Summary judgment is an extreme remedy, not intended as a substitute for trial. It is appropriate to dispose of legal, not factual issues and, therefore, it is authorized only when the movant is entitled to judgment as a matter of law because there are no genuine issues of material fact." *Piner*, 519 N.W.2d at 339 (citations omitted). In this case, Continental has failed to show the absence of genuine issues of material fact. *Dept. of Rev. v. Thiewes*, 448 N.W.2d 1, 2–3 (S.D.1989). We therefore reverse the trial court's grant of summary judgment and remand for trial.

[¶ 18] AMUNDSON and GILBERTSON, JJ., concur.

[¶ 19] MILLER, C.J., and KONENKAMP, J., concur specially.

KONENKAMP, Justice (specially concurring).

[¶ 20] I write to expand upon the majority's discussion of the material issues of fact and the governing legal principles in this tangled dispute. In the first place, two separate Article Nine priority battles are involved here: Continental versus Shasta and Continental versus Heritage Bank. Shasta claims an interest in 650 head of cattle delivered to

Continental in April 1994, while Heritage Bank claims an interest in cattle delivered earlier. Therefore, Shasta's and Heritage Bank's security interests are not coexistent and must be examined separately.

### [¶ 21] I. Continental versus Shasta

[¶ 22] Shasta contends Margery never acquired sufficient rights in the collateral for Continental's security interest to attach, thus defeating any claim Continental asserts to the 650 head of cattle. *See* SDCL 57A–9–203. This argument is premised on the belief Shasta reserved title until the checks cleared, thus Bud was unable to transfer an interest in the cattle because his checks were dishonored and Shasta then had a right to reclaim the cattle. *See* SDCL 57A–2–401. Continental insists it acquired superior rights in the cattle when it advanced money in reliance upon its security agreements, precluding Shasta from reclaiming the cattle. The Uniform Commercial Code (UCC) furnishes a means to classify these competing interests.

[¶ 23] The commercial transaction between Shasta and Bud was a "cash sale." Bud received delivery of the cattle upon payment to Shasta. Although the checks were later dishonored, this fact is of no consequence in deeming the transaction a "cash sale." In such a transaction Shasta had an implied right to reclaim the cattle, subject to certain well recognized exceptions. *See Szabo v. Vinton Motors, Inc.,* 630 F.2d 1, 3 (1st Cir.1980)("Although the right of . . . a cash seller to reclaim goods sold in a 'bad check' transaction is not specifically set forth in the Code provisions, such a reclamation right is inherent in 2–507(2) and 2–511(3) . . . .")(footnote omitted). SDCL 57A–2–507(2) provides:

Where payment is due and demanded on the delivery to the buyer of goods or documents of title, his right as against the seller to retain or dispose of them is conditional upon his making the payment due.

The meaning of this statute is clarified by the official comments:

[S]ubsection (2) codifies the cash seller's right of reclamation which is in the nature of a lien. There is no specific time limit for a cash seller to exercise the right of reclamation. However, the right will be defeated by delay causing prejudice to the buyer, waiver, estoppel, or ratification of the buyer's right to retain possession. . . . *If third parties are involved, Section 2–403(1) protects good faith purchasers.*

UCC § 2–507, cmt 3 (1990)(emphasis added).[1] SDCL 57A–2–403(1) states:

A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. *A person with voidable title has power to transfer a good title to a good faith purchaser for value. . . . even though . . . (b) The delivery was in exchange for a check which is later dishonored* [.]

"Title" in the context of the UCC is not always subject to formal transfer of documents. *See First Nat. Bank v. Pleasant Hollow Farm, Inc.,* 532 N.W.2d 60, 63 (S.D.1995)(formal title not prerequisite for attachment of security interest, hence prevents avoiding UCC rules by manipulating locus of title). *See also Jordan v. Butler,* 182 Neb. 626, 156 N.W.2d 778, 783 (1968)(creditor obtained valid security interest in cattle, despite debtor's voidable title, pursuant to 2–403(1)). In an oft cited Article Nine case, the Fifth Circuit explained:

Section [2–403] gives certain transferors power to pass greater title than they can themselves claim. Section [2–403(1)] gives good faith purchasers of even fraudulent buyers-transferors greater rights than the defrauded seller can assert. This harsh rule is designed to promote the greatest range of freedom possible to commercial vendors and purchasers.

---

1. Before a 1990 amendment to the official comments, the cash seller was subject to a ten day time limit to assert the right of reclamation. *See* PEB Commentary No. 1 dated March 10, 1990. The editorial board concluded "there is no justification for barring the cash seller's right or reme-dy of reclamation before discovery of non-payment. There is no specific time limit for a cash seller to exercise the right of reclamation. The right may be exercised as long as there has not been an excessive delay causing inequitable prejudice to the buyer."

*In re Samuels & Co., Inc.*, 526 F.2d 1238, 1242 (5th Cir.1976), *cert denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976). *See also O'Brien v. Chandler*, 107 N.M. 797, 765 P.2d 1165, 1168 (1988) (2–403(1) allows certain transferors to pass greater title than they themselves claim).

[¶ 24] Because Bud[2] had the authority to transfer voidable title, the emphasis shifts to determine whether Continental can claim refuge afforded a "good faith purchaser for value." SDCL 57A–2–403(1). The undisputed facts in this case clearly show Continental was a "purchaser for value."[3] The circuit court, however, was required to determine whether Continental acted in "good faith." Continental is by definition a "merchant"[4] for purposes of the UCC and hence, "good faith" equates to "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." SDCL 57A–2–103(1)(b). Deciding good faith is a question of fact. *Kunkel v. United Security Ins. Co.*, 84 S.D. 116, 129, 168 N.W.2d 723, 730 (S.D.1969). Persons claiming actions were in bad faith or in violation of commercially reasonable standards have the burden of proof. *See* SDCL 57A–1–208 ("The burden of establishing lack of good faith is on the party against whom the power has been exercised.").

[¶ 25] Shasta maintains South Dakota's branding laws supersede the UCC and are dispositive of whether title was properly transferred. While I disagree the branding laws override the UCC, Continental's knowledge of their existence, how they consummate the usage of trade in the cattle industry, and Continental's compliance therewith, would be factors in the circuit court's determination of good faith.

[¶ 26] In summary, I would remand for trial on whether Continental acted in good faith. If the circuit court finds Continental acted in good faith, its perfected security interest takes priority over Shasta's unperfected interest. *See* SDCL 57A–9–301; 9–312. If it finds Continental was not a good faith purchaser, Continental cannot assert the protections provided by SDCL 57A–2–403(1) and Shasta would have priority.

[¶ 27] **II. Continental versus Heritage Bank**

[¶ 28] The circuit court concluded Heritage Bank had no security interest in the 650 cattle discussed in the Shasta transaction, but Heritage claimed no interest in these cattle. The court failed to ascertain whether Heritage Bank acquired an interest, via Welte, in other cattle Bud placed at the Continental feedlot before April 1994. The record clearly reflects there were other cattle in the feedlot, purportedly owned by Margery, before the Shasta transaction. *See* majority footnote 4. The circuit court must

---

2. Bud's authority to transfer an interest in the cattle was present regardless of whether he was acting in an individual capacity, or as an agent for Western Cattle Inc., Welte or Margery. In this case the proper focus is upon Shasta releasing possession of the cattle and the potential for Bud to mislead third parties.

3. " 'Purchaser' means a person who takes by purchase." SDCL 57A–1–201(33). " 'Purchase' includes taking by sale, discount, negotiation, mortgage, pledge, lien, issue or re-issue, gift or any other voluntary transaction creating an interest in property." SDCL 57A–1–201(32). "[A] person gives 'value' for rights if he acquires them ... (c) By accepting delivery pursuant to a preexisting contract for purchase; or (d) Generally, in return for any consideration sufficient to support a simple contract." SDCL 57A–1–201(44). Here, Continental had a validly executed security agreement signed by Margery with an after acquired property clause. Further, pursuant to past course of dealings with Bud, Margery and

Western Cattle Inc., Continental loaned Western Cattle Inc. $252,437.17, with its collateral for the loan being the cattle here in question. See also *In re Samuels*, 526 F.2d at 1242 (purchaser includes an Article Nine secured party); *Jordan*, 156 N.W.2d at 783 (secured creditor is a purchaser for purposes of UCC § 2–403); *O'Brien*, 765 P.2d at 1168–69 (creditor qualifies as purchaser for purposes of UCC § 2–403); RONALD A. ANDERSON, UNIFORM COMMERCIAL CODE, 3rd Ed vol 1 § 1–201:169 (1981)("The term 'purchaser' is sufficiently broad to include a secured party under Article 9.").

4. SDCL 57A–2–104(1) defines "merchant" as:

[A] person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

determine whether Welte had a sufficient ownership interest in any of these cattle for Heritage Bank's security interest to attach.

[¶ 29] If the court finds Heritage Bank had an interest in identifiable cattle placed at the feedlot, then a decision on Continental's status as a "good faith purchaser for value" must also be made, per the above analysis, to decide the priority status of the parties. Hence, I agree with the majority that further findings must be made before complete resolution of this issue can be made.

[¶ 30] **III. Attorney Fees**

[¶ 31] If the court finds Continental acted in good faith, it must then decide whether Continental is entitled to attorney fees and in what amount. The security agreement between Margery and Continental provided: "The security interest herein granted shall secure . . . any and all costs of collection or enforcement thereof, including . . . reasonable attorney's fees[.]" It also stated "This Agreement, and all instruments executed pursuant hereto, shall be governed by and interpreted in accordance with the laws of the State of Illinois." When the parties have agreed to be bound by the law of a specific place and the agreement is fair and reasonable, the law of their choice applies. *Baldwin v. Heinold Commodities, Inc.*, 363 N.W.2d 191, 195 (S.D.1985). Generally, a security agreement is effective between the parties and as to third parties. *See* SDCL 57A-9-201.

[¶ 32] Illinois law provides:

A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . . The proceeds of

disposition shall be applied in the order following to

(a) the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and, *to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;*

(b) the satisfaction of indebtedness secured by the security interest under which the disposition is made;

(c) the satisfaction of indebtedness secured by any subordinate security interest in the collateral . . .

Ill.Ann.Stat. Ch. 810, par. 5/9-504(1) (Smith-Hurd 1993 & Supp 1995). Continental claimed attorney's fees in excess of $96,000. Continental has not cited any persuasive authority to this Court authorizing the award of these attorney fees[5] and therefore I would remand for further findings on whether Illinois law permits these fees. If the court finds Illinois law provides for an award, then it must make a finding on the reasonableness of the fees. If the fees are not authorized under Illinois law or the reasonable amount of fees do not surpass the excess funds available to pay subordinate creditors, then the cattle sales proceeds must be traced and apportioned to Shasta and Heritage Bank.

[¶ 33] MILLER, Chief Justice joins this writing and I am authorized to so state.

---

5. Continental refers us to Ill.Rev.Stat. Ch. 17, par. 6407 § 4.2(c) [our statutory compilation Ill. Ann.Stat.Ch. 815, par. 205/14.2(c)(Smith-Hurd 1993 & Supp 1995)], which is part of the "Inter-

est Act." There is a question of whether Continental falls within the scope of this Act and the circuit court should make this determination on remand.