1998 SD 118

CONTINENTAL GRAIN COMPANY,
Plaintiff and Appellee,

v.

Margery BRANDENBURG, Western
Cattle, Inc., and Louis J. Welte,
Defendants,

and

Heritage Bank and Western Video Cattle,
Inc., Defendants and Appellants.

Nos. 20357, 20358.

Supreme Court of South Dakota.

Argued Sept. 15, 1998.

Decided Dec. 9, 1998.

Dennis H. Hill of Costello, Porter, Hill, Heisterkamp & Bushnell, Rapid City and David Lebas of Gibson, Ochsner & Adkins, Amarillo, TX, for appellee Continental Grain.

Terry L. Hofer of Bangs, McCullen, Butler, Foye and Simmons, Rapid City, for appellant Heritage Bank.

Robert M. Nash of Wilson, Olson, Nash & Becker, Rapid City, for appellant Western Video.

GILBERTSON, Justice.

[¶ 1.] This action arises out of a consolidation of three lawsuits involving Continental Grain Company (Continental), Heritage Bank (Heritage) and Shasta Livestock Auction Yard (Shasta). The parties requested a determination of priorities of security interests in cattle. The circuit court, granted Continental's motion for summary judgment and the other creditors appealed. This Court, held that genuine issues of material fact precluded summary judgment and remanded the case to the circuit court. After a trial on the merits, the trial court granted a declaratory judgment for Continental. Again, Heritage and Shasta appeal. We affirm.

### FACTS AND PROCEDURE

[¶ 2.] Bud Brandenburg (Bud) is a cattle order buyer. His purchases were financed by a number of sources, including Louis Welte (Welte), through Heritage.[1] Welte authorized Bud to sign checks on Welte's Heritage account. In the normal course of business, Bud would buy cattle by writing a

---

1. Welte is an order buyer and allowed Bud and several other buyers to purchase cattle and write checks on his account. According to bank officers, the practice of order buying would have Welte holding cattle for a brief time. During this time the cattle would be purchased, transferred to a new owner and the checks collected and cleared.

Welte was not optimistic about the cattle market and did not want to own any cattle in 1994, so he authorized only transactions where he or one of his agents already had a third party buyer.

check on Welte's account to the seller. The cattle were then sold to a third party and the money from the sale was used to repay Welte. In return for the use of Welte's money, Bud paid a commission or interest.

[¶ 3.] Western Cattle, Inc. (Western), a cattle buying corporation, is owned by Bud's spouse, Margery Brandenburg (Margery) and her daughter. Margery had an agreement with Continental wherein Continental would lend money on cattle delivered to Fall River Feedlot in Hot Springs, South Dakota. Continental would charge her interest on the loan as well as for feed and costs. Margery, individually, signed a security agreement with Continental in October 1991 and a financing statement for livestock she placed "on feed" at the Fall River Feedlot in 1994. The security agreement contained an after-acquired property clause. Generally, Continental would lend money by sending a check to either Margery or Western when a load of cattle arrived. Continental would send a promissory note for Margery's signature once the cattle had been sorted and placed on the lot. Continental fed the cattle until they were ready and then sold them, usually to a packer. Then, Continental would pay off its loan and its bill for feed and costs and forward any profits to Margery's personal bank account.[2]

[¶ 4.] In April 1994, Bud bought 650 heifers from Shasta's video auction, which were branded with a hoofprint on the right rib. Shasta gave Bud a receipt that indicated he was the buyer of the cattle. Bud presented two checks to pay for the cattle. One check was written by Western and signed by Margery. This check was returned for non-sufficient funds. The other check was written by Bud on Welte's account. Welte or his bank, Heritage, stopped payment on the check.

[¶ 5.] Before the checks cleared the bank, the cattle were shipped to Continental's Fall River Feedlot. A California brand inspection certification identified Bud as the consignor, or shipper, of the cattle. A South Dakota brand inspector's tally identified Bud as the "owner of the brand." Bud called and told Continental the cattle would be placed on its feedlot for Margery. Based on several years of past dealings, Continental mailed Western a loan check for $252,437.17 on May 2, 1994. Continental prepared a promissory note and sent it to Margery. She received the note after the parties realized both checks had been returned. Under the advice of counsel, she refused to sign the note.

[¶ 6.] After Shasta discovered the checks did not clear the banks, its employees called the Fall River Feedlot and requested the cattle be returned. Continental refused to return the cattle, claiming it had a security interest from Margery.

[¶ 7.] From February to April of 1994, Bud bought a number of cattle using Welte's account without having a buyer. The evidence establishes Bud sent the cattle to the Fall River Feedlot, put them in Margery's name and Fall River issued advances on the equity. Bud took the advances and instead of paying Welte, squandered the money speculating in the commodities market.[3] Because of Bud's

---

2. Clayton Lambeth, general manager of the Fall River Feedlot, testified as follows regarding the arrangement with Margery:

Q: How did Margery Brandenburg make payments to Continental on any cattle that she had purchased and placed at the feedlot[?]

A: She didn't make any payments to Continental Grain or Fall River Feedlot. The mechanics of the way it worked was, ... a particular bunch of cattle cost $650 per head delivered to our facilities with the ... cost of the cattle and the freight and all the cost. We would advance the $650, less the down payment of $150, so her contribution to the package is $150. Then we would advance the $500, which would be the differential, so she never wrote us any checks.

Q: ... How did Continental get paid?

A: Continental got paid actually when the cattle went out of our facilities to the packers when we received those proceeds. What we do at that point is if the cattle broke even, then she would get her $150. If the cattle made more than $150, she'd get more than that. If they lost some of the $150, she would get less....

Q: She wouldn't actually get a check back until the cattle had been sold and Continental had been paid?

A: That's correct.

3. At the onset of this litigation the parties learned that Bud was a convicted felon and had served time in a federal penitentiary. He also has an 1988 civil judgment in the amount of approximately $340,000 against him.

misuse of Welte's account, Welte now owes his bank over $700,000.00.

[¶ 8.] On May 18, 1994, Continental filed a declaratory judgment action. According to the complaint, Continental held approximately 1,500 cattle for the Brandenburgs at that time. Continental requested the trial court declare its security interest in the 1,500 cattle valid and enforceable and declare that Continental could sell the cattle. Continental also requested the trial court determine its security interest had priority over the security interests of Shasta, Welte and Heritage. In response, Heritage filed a declaratory judgment action.[4] On June 15, 1994, Shasta counterclaimed for rescission of its contract with Bud and for a declaratory judgment that Margery never owned any interest in the livestock. The trial court consolidated the lawsuits on October 6, 1994.

[¶ 9.] Continental held the cattle and sold them in the fall of 1994. Continental paid itself $252,437.17 for the loan, plus additional sums for feed, care, trucking and interest. Approximately $80,000 remained as a credit on Margery's account after the sale.

[¶ 10.] Continental, Shasta and Heritage filed motions for summary judgment. After Continental was granted summary judgment, it applied to the trial court for payment of its attorney fees. The trial court allowed the attorney fees against Margery and permitted Continental to apply the $80,000 balance from her account. Heritage and Shasta appealed to this Court and we reversed the grant of summary judgment. *Continental Grain Co. v. Heritage Bank*, 1996 SD 61, 548 N.W.2d 507.

[¶ 11.] In the remanded case, the trial court granted a declaratory judgment in favor of Continental, ruling Heritage and Shasta were estopped from alleging any claim against Continental. Continental again applied to the trial court for payment of its attorney fees totaling $144,712.10. The trial court awarded the fees against Margery and permitted Continental to apply the $81,078.87 balance from her account to its attorney fees.

[¶ 12.] On appeal, Heritage and Shasta raise several issues. We combine them as follows:

1. Whether the trial court erred in its finding Margery had sufficient rights in the cattle to support attachment of Continental's security interest.

2. Whether the trial court erred in the award of attorney fees and if not, were the fees reasonable.

### STANDARD OF REVIEW

[¶ 13.] "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." SDCL 15–6–52(a). We review findings based on documentary and deposition evidence de novo and do not apply the clearly erroneous rule set forth in SDCL 15–6–52(a). *Watertown v. Dakota, Minn. & Eastern R. Co.*, 1996 SD 82, ¶ 11, 551 N.W.2d 571, 574 (citing *First Nat. Bank of Biwabik v. Bank of Lemmon*, 535 N.W.2d 866, 871 (S.D.1995)). "We review conclusions of law under a de novo standard." *Jasper v. Smith*, 540 N.W.2d 399, 401 (S.D.1995) (citing *Cordell v. Codington County*, 526 N.W.2d 115, 116 (S.D.1994)). "Under this standard we give no deference to the trial court's conclusions of law." *Id.*

---

4. Heritage Bank claims a security interest in cattle which Margery placed at the Fall River Feedlot, but not the 650 cattle claimed by Shasta in this case. Heritage Bank admits it or Welte stopped payment on the Shasta check and therefore claims no interest in the 650 cattle. Heritage Bank bases its security interest in cattle on security agreements from Welte dated May 29, 1991 and May 12, 1994, a loan agreement dated March 22, 1994, a promissory note dated May 12, 1994, and financing statements filed with the South Dakota Secretary of State on May 13, 1994. The security agreement pledges, among other things, a purchase money security interest in "865 hd cattle located at Fall River Feedlot." There is no evidence of a security agreement between Welte and Bud, Margery or Western.

Bud's handwritten answer to Heritage's original complaint, filed April 12, 1995, stated in part: "All monies from Weltes Heritage Bank & or Continental Grain Co. were used for Cattle Purchases, Commodity Cattle Contracts, Hedging & or Speculating for the benefit of the Welte & Brandenburg Cattle trading & cattle feeding venture." Bud provides little information of what happened to the money involved in these transactions. In his deposition, he invoked the fifth amendment on nearly every question.

## ANALYSIS AND DECISION

**[¶ 14.] 1. Whether the trial court erred in its finding Margery had sufficient rights in the cattle to support attachment of Continental's security interest.**

[¶ 15.] The South Dakota version of Article 9 of the Uniform Commercial Code provides in order for the creditor to receive maximum protection in a secured transaction it must follow the steps of attachment and perfection. *See generally* SDCL 57A–9–101 through 57A–9–507. As neither Shasta nor Heritage dispute that Continental's security interest was prior in time to any other perfected security interest in the livestock, the primary question Heritage and Shasta raise stems from the Article 9 concept of attachment.

[¶ 16.] SDCL 57A–9–203(1) provides three requirements that must be met before a security interest will attach and be enforceable against a debtor or a third party:

(a) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral . . . ; and

(b) Value has been given; and

(c) *The debtor has rights in the collateral.*

(Emphasis added). Heritage and Shasta claim the trial court erred in finding Margery had rights in the collateral sufficient for Continental's security interest to attach. These parties contend Margery lacked these rights because she had no control over the cattle. They claim Bud was using Margery as a pawn in his cattle order buying transactions.

[¶ 17.] "The phrase 'rights in the collateral' as used in [§ 57A–9–203] has no clear definition." *First Nat. Bank v. Feeney,* 393 N.W.2d 458, 460 (S.D.1986). In an Article 9 transaction, the rule is mere possession of the collateral by the debtor is not enough to grant sufficient rights for the security interest to attach. *Pleasant View Farms, Inc. v. Ness,* 455 N.W.2d 602, 604 (S.D.1990). *See generally* White & Summers, *Uniform Commercial Code* § 31–6, at 127 (4th ed 1995). Yet, as with many rules, there are exceptions. This Court has found formal title is not required for a debtor to have sufficient 'rights in the collateral' to allow a security interest to attach. *First Nat. Bank v. Pleasant Hollow Farm,* 532 N.W.2d 60, 63 (S.D.1995) (citing *Proceedings for Dep. in Court of Monies,* 417 N.W.2d 187, 188 (S.D. 1987)). A debtor may have sufficient rights to create a security interest when he does so with an authorization from the actual owner of the collateral. *Feeney,* 393 N.W.2d at 460 (citing *General Motors Accept. Corp. v. Washington Tr. Co.,* 120 R.I. 197, 386 A.2d 1096, 1098–99 (1978)). Also, a debtor may have sufficient rights in the collateral if he has something more than "naked possession." *Brown v. United States,* 622 F.Supp. 1047, 1050 (D.S.D.1985) (citing *Morton Booth Co. v. Tiara Furniture, Inc.,* 564 P.2d 210, 214 (Okl.1977)). (*Brown* was first cited by this Court in *Feeney*). White and Summers describe the phrase 'rights in the collateral' as stating a truism. White & Summers, *Uniform Commercial Code,* § 31–6, at 127. Essentially, "the debtor normally can only convey something once it has something and that something may be less than the full bundle of rights that one may hold in such property." *Id.*

[¶ 18.] In *Pleasant Hollow,* this Court stated that control over the collateral is the factor that determines the debtor's rights in the collateral, not ownership. 532 N.W.2d at 63. (citing *Proceedings,* 417 N.W.2d at 188).

[E]ven if a party retains ownership interest in a piece of collateral, a debtor who retains that collateral is still able to mislead potential creditors by exercising his "rights" of possession and control over the collateral. It is the outward appearance of a *debtor's* rights of ownership and control in the collateral that determines whether attachment of a security interest is effective and not the right of a party who may have title to the collateral.

*Pleasant Hollow,* 532 N.W.2d at 63 (citing *Brown,* 622 F.Supp. at 1050) (emphasis in the original).

[¶ 19.] Bud and Margery maintained a business relationship with Continental for many years. They began the transactions in Bud's name. After Bud was convicted of a

federal felony and a civil judgment was rendered against him, the family cattle business was done in Margery's name.[5] In oral arguments, counsel for Heritage claimed Margery was a strawperson without any control and therefore could not have rights in the collateral. We are not persuaded by this allegation. The record shows Margery, while not exclusively, was nevertheless directly involved in the Brandenburg business enterprise. For example, sometime after 1990, Margery gave Fall River Feedlot employee Pat Scheltens deposit slips for her personal checking account. When Margery handed them to Pat she instructed her to "put the fat money in my account."[6]

[¶ 20.] In her deposition testimony, Margery seems to have a memory of convenience. However, it is clear she is not the "strawperson" Heritage would like her to be.

This is demonstrated by the fact she knew what "fat" money was and was quite clear on where she wanted Continental to deposit *her* money. Moreover, Margery signed all sales contracts, promissory notes, UCC Form 1 financing statements, feeding agreements and security agreements with Continental from 1989 onward. Some of these transactions were in the hundred thousand dollar range. It is difficult to comprehend a person would, for five years, continuously sign paperwork involving transactions of these amounts without a basic knowledge of the contents. Margery also stated in her deposition, she knew they were doing business in her name because of Bud's judgment and it was just a way they made their living. These facts indicate that Margery gave Continental the outward appearance of ownership and control over the cattle. This brings

---

5. Clay Lambeth, Supervisor of the Fall River Feedlot, claims no knowledge of Bud's felony conviction or the civil judgment prior to the onset of this litigation.

6. In her deposition Pat recalled this encounter with Margery.

> Q: Do you recall ... a time that you saw Miss Brandenburg?
> A: She was in our office, she came with Bud. I couldn't tell you the year for sure. And she left a deposit slip because they were going to Minnesota, I believe.... She left a—deposit slips so when we sold fats we could send the money directly to the bank.
> * * *
> Q: Whose account was it? Was it her personally?
> A: Margery's. Only Margery's.
> Q: You said deposit fats. For someone who doesn't really deal with the feedlot every day, could you—
> A: When the cattle are finished and they were sold and slaughtered and then the money—we'd withhold what she owed us and then send the balance on that pen, if any. In this case there would have been.
> * * *
> Q: And they—some [cattle] were about to be marketed for her?
> A: Yes. I don't recall if they were about to be marketed or had been sold.
> Q: But she personally —
> A: Yes.
> Q: —presented you a deposit slip where you would send to her bank and for her account the money that was left over after the cattle were sold and all accounts settled with the Fall River Feedlots?
> A: Yes.

> Q: So that would be, in effect, her profit on that pen of cattle?
> A: Yes. Or what was left of the equity....
> Q: In her handing the deposit slip to you, did you assume that she was preparing— doing just a ministerial act, or did she—in the discussions, did you assume and presume from the discussions she knew what she was doing?
> A: I presumed so, yes.

Margery gave similar testimony about this incident in her deposition.

> Q: Do you remember a time when you and Bud went to the feedlot and you handed Pat Scheltens some deposit slips and said, "Use these for the fats when they're sold," because you were on the way to take care of a relative?
> A: It could be, but I don't remember it. It could be.
> * * *
> Q: Okay. All right.
> A: Un-huh. There was money that went into this account (Margery's personal checking account) but it was only for profits from the cattle.
> * * *
> Q: If you did [give Pat Scheltens the deposit slips], what was your intention, what did you intend Fall River Feedlots to do for you?
> A: Well, to deposit the profits into the bank.
> * * *
> Q: [T]hat was your operating procedure, that the money that you received from Fall River Feedlots from the sale of a pen of your cattle would go into this account?
> A: Yes, I believe so.
> Q: Okay, all right. And did Fall River Feedlots comply with your directions to put the money into that account?
> A. Yes.

us to the conclusion she did have the necessary rights in the collateral to make attachment of the security agreement effective.

[¶ 21.] Although it is not always determinative on the issues of attachment and priority, the doctrine of estoppel may defeat competing claims when owners fail to protect themselves and allow others to retain control over collateral. SDCL 57A–1–103 permits legal and equitable concepts to supplement the provisions of the UCC.

> [M]ere possession of collateral does not create sufficient rights in the collateral for a security interest to attach, the necessary rights, otherwise non-existent, may be created by means of estoppel. *If the owner of collateral allows another to appear as the owner or to dispose of the collateral, such that a third party is led into dealing with the apparent owner as though he were the actual owner, then the owner will be estopped from asserting that the apparent owner did not have rights in the collateral.*

*Ness,* 455 N.W.2d at 604, (citing *In re Pubs, Inc.,* 618 F.2d 432 (7th Cir.1980)). (Emphasis added).

[¶ 22.] This Court has applied the doctrine of estoppel in several priorities cases. *See Pleasant Hollow,* 532 N.W.2d 60; *Ness,* 455 N.W.2d 602; and *Proceedings,* 417 N.W.2d 187. In *Ness,* Darold Tomsheck (Tomsheck), an officer of Pleasant View, entered into an oral agreement with Leroy Ness (Ness). *Ness,* 455 N.W.2d at 603. Ness was to care for livestock belonging to Pleasant View in exchange for the year's calf crop. *Id.* Ness was to be liable for all death loss, from any cause, exceeding two percent of the number of the herd. *Id.* During the year a severe blizzard killed 51 cows. *Id.* The surviving herd produced 25 calves. *Id.* Prior to this agreement Ness granted FmHA a security interest in his presently owned and after-acquired livestock. *Id.* The security agreement was perfected. *Id.* Pleasant View and the FmHA both claimed a superior interest in the calves. *Id.* at 604.

[¶ 23.] The trial court concluded Pleasant View was entitled to all 25 calves because of the death loss. *Id.* However, the court found Ness' rights in the calves were sufficient to enable the security interest of FmHA to attach and it took priority over any interest of Pleasant View. *Id.* Pleasant View appealed to this Court. *Id.*

[¶ 24.] We held Ness did have rights in the collateral sufficient for the security agreement to attach. *Id.* at 604. Ness' rights were created by means of estoppel. *Id.* Since Pleasant View had allowed Ness to appear as the owner, FmHA was led to dealing with him as the actual owner. *Id.* Pleasant View was estopped from alleging Ness did not have sufficient rights in the collateral for attachment. *Id.* (citing *In re Pubs, Inc.,* 618 F.2d 432).

[¶ 25.] Prior to this Courts holding in *Ness,* we applied a similar doctrine in *Proceedings,* 417 N.W.2d 187. In *Proceedings,* Ralph Kemnitz (Kemnitz) and Keith Tidball (Tidball) entered into an agreement involving the termination of their law partnership known as "Tidball and Kemnitz." *Id.* at 187. The agreement provided Tidball was to receive all interest in accounts receivable listed in the Pierre office books, with an exception of contingency fee cases listed on an exhibit. *Id.* One exception was the fee awarded in the case of *Tidball v. Hetrick* (known as the William's estate fee). *Id.* When received, the fee was to be divided, with 80% going to the partnership and 20% going to Tidball. *Id.*

[¶ 26.] Tidball entered into a security agreement with BankWest pledging as collateral the entire William's estate fee. *Id.* at 187–188. BankWest completed all the necessary steps for perfecting its security interest. *Id.* at 188. In February of 1984, Tidball assigned the judgment obtained in the *Hetrick* suit to First National Bank. *Id.* Kemnitz brought suit and the trial court found for the banks. *Id.*

[¶ 27.] Kemnitz appealed, raising two issues. *Id.* First, he claimed the trial court erred in finding that BankWest had a valid security interest in the proceeds. *Id.* Kemnitz alleged since Tidball did not own the entire fee he did not possess the 'rights in the collateral' necessary for the security interest to attach. *Id.* Second, Kemnitz claimed the assignment to First National Bank was effective only as to Tidball's interest. *Id.*

[¶ 28.] This Court held when dealing with 'rights in collateral,' it was "the outward appearance of a *debtor's* rights of ownership and control in the collateral that determines whether attachment of a security interest is effective...." *Id.* (Emphasis original). "An innocent third party, such as BankWest, should not be penalized or misled due to the failure of Kemnitz to properly protect his interests in a partnership account...." *Id.* at 189. As for First National Bank obtaining assignment of judgment, Kemnitz never attempted to intervene in the litigation nor advise third parties of his interest in the judgment. *Id.* Therefore, the properly perfected assignment of the judgment constituted a lien against the proceeds which Tidball had the authority to grant. *Id.*

[¶ 29.] The case at hand cannot be distinguished from *Ness* or *Proceedings.* Continental should not be penalized for the failure of Shasta, Welte and Heritage to assert their rights. Shasta conducted a number of transactions with Bud in the same matter. Several checks which Bud used to buy cattle from Shasta were returned non-sufficient funds.[7] Shasta continued to take checks from Bud, regardless of the number of checks which were returned. Counsel for Shasta defended this practice by stating eventually the Brandenburgs covered all the checks, except for the final check, and this was the reason it continued to accept Western checks. We find this practice to be less than reasonable. That Shasta did not protect itself by using Article 9 or some other means after the first check was returned is negligence. That it did not arrange to protect itself in all other transactions with Bud is without justification. Article 9 was enacted to provide a protective mechanism for businesses like Shasta. Aside from not taking any protective measures, Shasta failed to inform Continental of its rights in any cattle at the Fall River Feedlot until it was too late.

[¶ 30.] Heritage and Welte were equally negligent. For many years, Welte had carried on business with a number of cattle order buyers. Heritage knew exactly how Welte's business functioned and should have foreseen the potential for abuse. Both parties knew Bud was conducting questionable transactions and should have been alert to the possibility Bud was less than honest. Welte did not even know Bud when he began doing business with him. He did not conduct a background check on Bud before making his business proposal or granting him signature authority on his account. Welte was aware as early as 1990 that Margery Brandenburg funds were being deposited in his account to pay back advances made to purchase cattle. Welte indicated in his deposition he knew some cattle sellers would not take Bud's checks. Welte also received checks from Bud which were returned non-sufficient funds. Even more troublesome are the events that occurred in February 1994. In February, Bud bought cattle using a Welte check. Welte never had any idea what happened to the cattle or the money. He called Bud several times and demanded an answer. Although Bud presented several different "stories," Welte still did not take any action. The February transaction was just the beginning of a series by Bud in which he never reimbursed Welte for his advances.

[¶ 31.] All of these facts should have put Welte on notice that something was amiss and he should have acted accordingly. Welte and Heritage knew Bud sent the cattle to the Fall River Feedlot. Yet they did not inform Continental of their possible interest in any of the cattle. Moreover, Heritage did not arrange for protection under Article 9, until this final transaction came to its attention.[8] By that time it was too late.

[¶ 32.] Considering Shasta and Heritage's negligent behavior and noncompliance

---

7. A total of six (6) checks written by Western Cattle to Shasta were returned non-sufficient funds: Check # 4213 for $30,000.00 dated 6–22–92; check # 4609 for $180,592.46 dated 2–10–94; check # 4543 for $90,802.55 dated 11–1–93; check # 4519 for $19,973.82 dated 9–27–93; check # 4610 for $80,448.59 dated 2–10–94; and check # 4656 for $173,778.32 dated 5–6–94.

8. We will not consider Heritage's argument that Welte had rights in the collateral sufficient to grant a security interest to Heritage. Heritage and Welte are equally estopped from claiming any interest in the cattle.

with Article 9, both are estopped from alleging any claim against Continental.[9] We therefore hold the trial court did not err in its conclusion that Heritage and Shasta are estopped from claiming Margery did not have sufficient rights in the collateral for attachment to occur.

**[¶ 33.] 2. Whether the trial court erred in the award of attorney fees and if not, were the fees reasonable.**

[¶ 34.] Continental requested the court award it the remaining $81,078.87 of Margery's account at Fall River Feedlot to off-set its legal expenses. It based this award on a provision for attorney fees in the security argument. The agreement provides that all disputes under the contract will be resolved under the laws of Illinois. Pursuant to the case of *Quinsippi Corp. v. Bening,* 105 Ill.App.3d 241, 61 Ill.Dec. 40, 433 N.E.2d 1368 (IllAppCt 1982), the trial court granted Continental's request for attorney fees. Heritage and Shasta take issue with the award of attorney fees. They claim the trial court erred in its award of attorney fees and the fees awarded are unreasonable.

[¶ 35.] The record reflects the Loan and Security Agreement between Margery and Continental provided the borrower will pay "reasonable attorney's fees and legal expenses" that are necessary to preserve and enforce Continental's interest as a first and prior lien. Under Illinois law, "[a]n attorney who seeks fees for remedying problems between a creditor and debtor must show the fees sought are reasonable." *Decatur Imaging Center v. Ames,* 237 Ill.App.3d 959, 181 Ill.Dec. 724, 608 N.E.2d 1198, 1202 (IllAppCt 1992) (citing *First National Bank v. Barclay,* 111 Ill.App.3d 162, 66 Ill.Dec. 854, 443 N.E.2d 780, 781 (IllAppCt 1982)); *Quinsippi,* 61 Ill.Dec. 40, 433 N.E.2d at 1369. "The amount of time spent on the case, the attor-

ney's ability, and the complexity of the case establish the appropriate fee." *Id.* The attorney must also indicate if he is seeking the fee from a former client or from an opponent. *First National Bank,* 66 Ill.Dec. 854, 443 N.E.2d at 781 (citations omitted). The court may not use speculation in determining fees. The court must rely on evidence for its determination. *Id.* (Citations omitted).

[¶ 36.] Applying the foregoing principles to the facts, Continental's attorneys provided the trial court with detailed billing statements concerning fees. The statements contain a description of the work done, the date, the time, indication of who did the work and all other charges. They also provided a signed affidavit requesting the award of fees. The affidavit also notes the fees charged are customary for the area. This evidence is more than sufficient to justify the trial court's award of attorney fees.

[¶ 37.] There is a second basis to affirm the fee award. The security agreement provides that "failure of the Borrower ... to perform any act or duty required by this Agreement" constitutes default. Margery was in violation of provision 1.c. which stated the "[b]orrower shall execute and deliver to Continental, its promissory notes...." On the advice of her attorney, Margery never signed the promissory note that concerns the Shasta transaction. Therefore, Margery defaulted on the security agreement.

[¶ 38.] The laws of Illinois govern the actions of the secured party after default. 810 IllCompStatAnn 5/9–504 (West 1993) provides:

(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral.... The proceeds of disposition shall be applied in the order following to

---

9. SDCL 40–19–24, provides that a registered brand is prima facie evidence of ownership of livestock. Bud was listed as the owner on the brand certificate. Relying on the statute, Shasta claims Bud was the only party who had rights in the collateral sufficient to allow a security agreement to attach.

Heritage claims that South Dakota brand laws do not control but should be considered under

the matters of good faith. In accordance with the concurrence in *Continental I,* we would agree with Heritage. Branding laws do not override the UCC. However, branding laws do "consummate the usage of trade in the cattle industry, and Continental's compliance therewith ... [and] would be factors in the circuit court's determination of good faith." *Continental I,* 548 N.W.2d at 513. (Konenkamp, J., concurring).

(a) the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and, *to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses* incurred by the secured party.

(Emphasis added).

[¶ 39.] Continental was within its rights under the security agreement and Illinois law to request attorney fees based on Margery's default. We affirm the trial court's award of the balance of Margery's Fall River Account to Continental.

[¶ 40.] MILLER, C.J., and SABERS, AMUNDSON and KONENKAMP, JJ., concur.

