2004 SD 40

AMERICAN BANK & TRUST, A South Dakota banking corporation, Plaintiffs and Appellees,

and

South Dakota Wheat Growers Association, Plaintiffs,

v.

Nathan SHAULL and Deborah Shaull, d/b/a Highmore Auction Sales, Defendants,

and

Fin–Ag, Inc., Defendant and Appellee,

and

AgStar Financial Services, PCA and Feldman Brothers, Defendants and Appellants.

No. 22627.

Supreme Court of South Dakota.

Argued Aug. 27, 2003.

Reassigned Feb. 4, 2004.

Decided March 31, 2004.

Brent A. Wilbur of May, Adam, Gerdes & Thompson, Pierre, SD, for plaintiffs and appellees American Bank & Trust.

Robert M. Nash of Wilson, Olson & Nash, Rapid City, SD, for defendant and appellee Fin–Ag, Inc.

Roger W. Damgaard and Susan M. Sabers of Woods, Fuller, Shultz & Smith, Sioux Falls, SD, Gary W. Koch and Dustan J. Cross of Gislason & Hunter, New Ulm, MN, for defendants and appellants.

MEIERHENRY, Justice (on reassignment).

[¶ 1.] This is a claim and delivery action brought by American Bank and Trust (American) involving 910 cows which were being held by a receiver. American originally brought this action against Nathan and Deborah Shaull d/b/a Highmore Auction Sales and Fin–Ag. American's com-

plaint contained three counts: (1) an action on the indebtedness, (2) claim and delivery/injunctive relief, and (3) deceit. AgStar Financial Services, PCA, Feldman Brothers [Feldman] (party defendants) and the South Dakota Wheat Growers Association (party plaintiff) intervened.

[¶ 2.] The issues before this Court center on priority of the claims to the cows among American, Fin–Ag, Feldman, and AgStar. American claims it has a valid perfected first security interest. Fin–Ag claims it has a valid perfected security interest subject to the perfected first security interest of American. Feldman claims ownership of the collateral giving him priority over American and Fin–Ag. AgStar claims an interest through a security agreement with Feldman. The bifurcated claim and delivery cause of action was tried to the court. The trial court entered a judgment declaring that American has a valid perfected first security interest to the collateral, that Fin–Ag has a valid perfected security interest subject to American's interest, that any ownership claim of Feldman or security interest of AgStar are subordinate and inferior to the perfected security interest of American and Fin–Ag. Feldman and AgStar appeal. We affirm. The issues on appeal are as follows:

I. WHETHER SHAULL HAD SUFFICIENT RIGHTS IN THE COLLATERAL TO SUPPORT THE ATTACHMENT OF AMERICAN'S AND FIN–AG'S SECURITY INTERESTS TO ENTITLE AMERICAN TO IMMEDIATE CLAIM AND DELIVERY.

II. WHETHER AMERICAN AND FIN–AG OR FELDMAN BROTHERS ARE ESTOPPED FROM ASSERTING A SECURITY INTEREST IN THE COLLATERAL.

III. WHETHER THE COWS AND CALVES ARE INVENTORY OR FARM PRODUCTS.

### Background and Facts

[¶ 3.] The core of this case centers on the demise of Nathan Shaull's livestock operations in the spring of 2002. Shaull owned and operated the Livestock Auction in Highmore, South Dakota; he bought and sold cattle through the sale barn and additionally acted as a cattle broker, buying and selling cattle as H.S. Cattle. American had financed Shaull. The financing consisted of a promissory note for $750,000 revolving line of credit dated September 27, 1999 and a second note for $498,413.50 for "breeding livestock" and refinancing of debt on June 8, 2001. The amount due to American on the revolving line of credit was over $750,000 and the amount due on the livestock loan was $325,461. In conjunction with both loans, Shaull executed a security agreement granting to American a security interest in all livestock owned or later acquired and additionally on the second loan, a security interest in all inventory and farm products, owned or thereafter owned by Shaull. American filed financing statements in the office of the South Dakota Secretary of State (Secretary) which covered the livestock and specifically as to the second transaction covered "all cows and 2001 future offspring, all increase, issue offspring, products and products from the livestock" and included the proceeds from the collateral.

[¶ 4.] Prior to American's financing, Shaull had financed his operation with Fin–Ag who had filed a financing statement with the Secretary in June of 1997 and July of 1998. When Shaull refinanced with American, Fin–Ag subordinated its security interest in the cows and calves by a Subordination Agreement and Assign-

ment of Security Interest in June of 2001 which was formalized with the filing of UCC–3 with the Secretary. Fin–Ag claims that approximately 4,500 head of cattle which it financed were missing and that Shaull owes Fin–Ag over two million dollars. Fin–Ag last inventoried Shaull's herd in May of 2001 approximately one month before American inspected Shaull's cattle for refinancing.

[¶ 5.] The Feldman brothers operated a farming and cattle feeding business in Minnesota. Feldman entered into an agreement with Shaull on November 30, 2000 wherein Feldman placed cows with Shaull for feeding and care. Pursuant to the agreement, Feldman purchased 1,536 cows between November 28, 2000 and December 15, 2001 which were placed with Shaull, 915 of which should have been in Shaull's possession at the time American did its refinancing inspection in June of 2001. AgStar had a Security Agreement with Feldman wherein it acquired a security interest in all the livestock owned or later acquired by Feldman. AgStar had not filed a financing statement in South Dakota.

### American's Inspection of the Collateral

[¶ 6.] On June 5, 2001, Shaull took two officers of American to inspect his cattle at three locations around Highmore and Miller, South Dakota. One location was owned by Shaull, the other two were rented. Because of the rough terrain, it was difficult to get an exact count of the herd; however, the group counted about 1,000 cows. Shaull ultimately set the number at 900 for purposes of collateral because he intended to cull some of the herd. Some of the cows were branded, some had ear tags, and some may not have had any identifying tag or brand.[1] Shaull main-

tained that he owned these cattle. If so, they would have been the same cattle previously financed by Fin–Ag. In Shaull's dealings with Fin–Ag, Fin–Ag had required Shaull to brand or ear tag his cattle with Fin–Ag's identification. American's inspection, although noting that some of the cattle were marked, did not specifically identify the brands or ear tags.

[¶ 7.] In addition to Shaull's representation to the bank that he owned the cows, American reviewed Shaull's financial statement and last tax return with the depreciation schedule for the cows. American further spoke with Fin–Ag who had financed the herd previously. No other verification of ownership was done by American prior to the loan approval. American knew that Shaull bought and sold cattle through his sale barn; however, it did not know of the agreement Shaull had with Feldman or that Shaull brokered cattle through H.S. Cattle.

### Identifying the 910 Cows Remaining

[¶ 8.] Around the middle of April, 2002, when Shaull's financial troubles became apparent, the South Dakota State Brand Board instigated an investigation of the remaining cows. All of the remaining cows were gathered in an effort to identify them. A total of 910 cows were counted. Of the total, 82 cows had Fin–Ag identifying ear tags; 571 can be traced to cows purchased by Feldman.

### Basis of Feldman's Claim to the Remaining Cows Held by the Receiver

[¶ 9.] Feldman claims that American and Fin–Ag's security interests cannot attach to the cows that he purchased and placed with Shaull under the Bred Cow Agreement. Feldman and AgStar claim that the Agreement established a bailment

---

**1.** South Dakota brand law does not mandate branding east of the Missouri River. SDCL ch. 40–20.

not requiring them to file a UCC–1 to protect their interests. American argues that had Feldman and AgStar filed financing statements, the bank would have been put on notice of their interest in the collateral.

### Whether the Trial Court Erred in its Findings of Facts or Conclusions of Law

[¶ 10.] This was a two-day trial to the court. At the end of the evidence, the trial court announced its decision in favor of American and directed counsel for American to propose Findings of Fact and Conclusions of Law for the court's signature. The trial court's Conclusions of Law 7 and 8 form the basis of the decision against Feldman and AgStar:

7.  By their failure to file UCC–1 financing statements and by allowing Shaull to appear to be the actual owner of the cow herd, Feldman and AgStar are estopped from asserting that Shaull, as the apparent owner, did not have rights in the cow herd.

8.  The cows and calves which are the subject of this action are farm products and not inventory.

### Standard of Review

■■■ [¶ 11.] Our standard of review is well established:

We review the circuit court's findings of fact under the clearly erroneous standard. Under this standard, we will only reverse when we "are left with a definite and firm conviction that a mistake has been made" after a thorough review of the evidence. We review conclusions of

law under the de novo standard without deference to the circuit court.

*In re Estate of Watson*, 2003 SD 142, ¶ 9, 673 N.W.2d 60, 62 (internal citations omitted).

In applying the clearly erroneous standard, our function is not to decide factual issues de novo. The question is not whether this court would have made the same findings that the trial court did, but whether on the entire evidence we are left with a definite and firm conviction that a mistake has been committed. This court is not free to disturb the lower court's findings unless it is satisfied that they are contrary to a clear preponderance of the evidence. Doubts about whether the evidence supports the court's findings of fact are to be resolved in favor of the successful party's "version of the evidence and of all inferences fairly deducible therefrom which are favorable to the courts action."

*Maryhouse, Inc. v. Hamilton,* 473 N.W.2d 472, 474 (S.D.1991) (internal and further citations omitted).

■■ [¶ 12.] Feldman claims that American and/or Fin–Ag cannot have a superior interest in the collateral because of Feldman's ownership interest which is detailed in the Bred Cow Agreement between Feldman and Shaull. Feldman provided evidence that he had purchased 1,536 cattle from November 28, 2000 to December 15, 2001 to be cared for by Shaull as part of the agreement, 1,407 of which he purchased from Shaull (as H.S. Cattle).[2] Fin–Ag claims that the cows

---

2.  A chronological summary of Feldman's purchases placed with Shaull under the Bred Cow Agreement are as follows:

a).  122 bred cows from H.S. Cattle on November 28, 2000;

b).  290 bred cows from Haas Livestock, and

c).  38 bred cows from Feldman feedlot in Prior Lake, Minnesota December 7, 2000;

d).  91 bred cows from Haas Livestock December 6–7, 2000;

e).  370 bred cows from H.S. Cattle (Shaull purchased 150 from Sampson's, 190

held by the receivership were the same cows that Fin–Ag had previously owned and sold to Feldman and were the same cows Fin–Ag had identified and inventoried on May 22, 2001. Feldman claims that American's own negligence caused its loss and that both American and Fin–Ag should be estopped from claiming a security interest in the collateral. Feldman points to American's failure to ascertain the ownership of the cattle prior to extending credit to Shaull, its lack of any inspection subsequent to loaning Shaull money, and its failure to follow its own internal policy in monitoring the custodial account.

[¶ 13.] The trial court found that American "had neither actual nor constructive knowledge of any claim of ownership by Feldman or any security interest claimed by AgStar". FF 26. The court further determined that, "[p]rior to making the June, 2001 loan to Shaull, American took all steps reasonably necessary to determine that its perfected security interest would attach to the cow herd." FF 28. When reviewing findings of the trial court, this Court should not substitute its judgment. As we have said, "[t]his court is not free to disturb the lower court's findings unless it is satisfied that they are contrary to a clear preponderance of the evidence." *Maryhouse*, 473 N.W.2d at 474. A thorough review of the evidence supports the court's findings and conclusions. The bank inspected the cows Shaull claimed were his, reviewed his financial statement and tax return and did a record search for UCC filings. The evidence further indicates that neither American nor others who dealt with Shaull knew of Feldman's ownership of the cows, except for one of Shaull's employees who worked with the cattle. Shaull did not indicate to the landowners from whom he rented the pasture that the cows were owned by someone else and he certainly did not tell American that Feldman owned the cattle.

[¶ 14.] The trial court further found that 625 of the cows that were inspected by American in June of 2001 were part of a lease purchase agreement between Shaull and Ron Jennings, a farmer near Miller, South Dakota. The court found that the Jennings' "cows were in Shaull's possession, control and apparent ownership at the time American inspected the cow herd in June, 2001 and were represented by Shaull as being owned by him." The Jennings' cows were later sold to Feldman in December of 2001.

[¶ 15.] The trial court was not clearly erroneous in finding that all the cows inspected by American in June of 2001 were the same cows held by the receiver. In fact, Shaull's employee testified that was the case. The trial court did not base its decision on the actual ownership of the cows and whether a bailment existed but on the apparent ownership of the cows under an estoppel theory.

[¶ 16.] We have previously stated that control rather than ownership of collateral determines a debtor's rights to collateral. *First Nat. Bank of Omaha v. Pleasant Hollow Farm, Inc.*, 532 N.W.2d 60, 63 (S.D.1995). We said in *Pleasant View Farms, Inc. v. Ness*, 455 N.W.2d 602 (S.D. 1990):

> If the owner of collateral allows another to appear as the owner or to dispose of the collateral, such that a third party is led into dealing with the apparent owner as though he were the actual owner, then the owner will be estopped from asserting that the apparent owner did not have rights in the collateral.

from Ogle Brother and 36 from Greg Clement) March 15, 2001;

f). 625 bred cows from H.S. Cattle December 15, 2001.

*Id.* at 604 (citing *In re Pubs, Inc.*, 618 F.2d 432 (7thCir.1980)).

[¶ 17.] The trial court found that AgStar was aware that Feldman placed cows with Shaull and that a UCC–1 financing statement needed to be filed in South Dakota to protect its interest. As early as 1999, AgStar had requested Feldman to provide Shaull's name, address and social security number, which Feldman did. However, neither AgStar nor Feldman filed a financing statement. The trial court determined that had they done so, American would have been put on notice of their claims prior to making the loan to Shaull in 2001. Although Feldman as the bailor could have filed a financing statement, he was not obligated to under the Uniform Commercial Code. SDCL 57A–9–505.

[¶ 18.] Finally, Feldman claims that the trial court erroneously determined that the cows were farm products and not inventory. Although Shaull invoked his right to remain silent under the Fifth Amendment rather than answer many of the questions put to him by the attorneys, he did admit that the cows he sold as H.S. Cattle were part of his farming operation, not the sale barn, thus making them farm products and not inventory. The trial court based this finding upon the testimony and evidence presented at trial. Although there may have been evidence to the contrary, "[d]oubts about whether the evidence supports the court's findings of fact are to be resolved in favor of the successful party's 'version of the evidence and of all inferences fairly deducible therefrom which are favorable to the court's action.'" *Maryhouse*, 473 N.W.2d at 474.

[¶ 19.] The question presented to the trial court was to determine the priority of claims. The question presented to this Court was whether Feldman's ownership of the cows gave Feldman and AgStar priority over American and Fin–Ag. The trial court determined based on the evidence, that Feldman and AgStar were estopped from claiming that Shaull did not have sufficient rights in the cows for a security interest to attach. Based upon the record, we cannot say that the trial court was clearly erroneous. The trial court is affirmed on all issues.

[¶ 20.] GILBERTSON, Chief Justice, and KONENKAMP, Justice, and TRIMBLE, Circuit Court Judge, sitting by Order of the Court, concur.

[¶ 21.] JOHNS, Circuit Court Judge, dissents.

[¶ 22.] JOHNS, Circuit Court Judge, sitting for SABERS, Justice, disqualified.

[¶ 23.] TRIMBLE, Circuit Court Judge, sitting for ZINTER, Justice, disqualified.

JOHNS, Circuit Judge (dissenting).

[¶ 24.] This is an appeal from a judgment entered by the circuit court for claim and delivery of a herd of cattle and for declaratory relief determining the rights of the parties to the herd. I would affirm in part, reverse in part, and remand.

[¶ 25.] At the outset, some further development of the facts is useful to our inquiry in this case. This action was brought by American Bank and Trust (American), a South Dakota state chartered bank, against Nathan and Deborah Shaull, d/b/a Highmore Auction Sales, and Fin–Ag, Inc. (Fin–Ag). The South Dakota Wheat Growers Association intervened as a party plaintiff and AgStar Financial Services, PCA (AgStar) and Feldman Brothers (Feldman) intervened as party defendants.

[¶ 26.] American is a South Dakota banking corporation with its principal

place of business in Huron, South Dakota. Fin–Ag is a South Dakota Corporation and subsidiary of Cenex Harvest States, a Minnesota based cooperative. AgStar is a financial institution organized and doing business under the laws of the United States with its principal place of business in Minnesota. Feldman is a Minnesota partnership whose principals are William Feldman and Peter Feldman.

[¶ 27.] Shaull was the owner of Highmore Auction Sales, a sale barn in Highmore, South Dakota. In addition, he conducted a cattle order brokering business under the name of H.S. Cattle and also had a cattle operation in which he ran his own cattle as well as those of Feldman. The genesis of this action was Shaull's refusal to account for several hundred head of cattle missing from the cattle operation and his repeated invocation of his right to remain silent about the cattle.

[¶ 28.] The trial court held that Nathan Shaull (Shaull) had an interest in the cattle at issue and that the security interests he gave to American and Fin–Ag attached to his interest. The trial court also held that since Feldman and AgStar failed to file UCC–1 financing statements on the cattle and allowed Shaull to appear as the actual owner and to borrow money against them from American, Feldman and AgStar were estopped from claiming any interest in the cattle against American and Fin–Ag.

[¶ 29.] Feldman and AgStar appeal. The South Dakota Cattlemen's Association, Minnesota State Cattlemen's Association, Iowa Cattlemen's Association and the National Cattleman's Beef Association have joined in filing an amicus curiae brief.

[¶ 30.] American, Fin–Ag and AgStar each claim a security interest in the 910 cattle that are the subject matter of this action. American and AgStar each claim a first priority interest. Feldman claims an interest subject only to AgStar's security interest. Fin–Ag claims an interest subject only to American's interest.

### American's Interest

[¶ 31.] Shaull obtained financing from American in the form of a revolving line of credit for $750,000 to cover any overdrafts in connection with the sale barn. Subsequently, he obtained an additional $498,413 to refinance a herd of brood cows previously financed by Fin–Ag. To date $750,000 remains due and owing on the line of credit and $325,461 on the refinanced herd.

[¶ 32.] In connection with the line of credit, Shaull executed a security agreement on September 27, 1999 granting American a security interest in all of his owned or after-acquired livestock. On October 19, 1999, American filed a financing statement in the office of the Secretary of State of South Dakota covering owned or after-acquired livestock.

[¶ 33.] In connection with the refinancing of the herd, Shaull executed a security agreement on June 8, 2001 granting American a security interest in all inventory and farm products owned or thereafter owned by Shaull. On June 13, 2001, American filed a financing statement in the office of the Secretary of State of South Dakota that covered all cows as well as all offspring, all products from the livestock and all proceeds.

### Fin–Ag's Interest

[¶ 34.] Shaull's relationship with Fin–Ag began with his participation in Fin–Ag's value added program. As part of the program, Fin–Ag placed a herd of cattle[3] with Shaull for care and feeding. Fin–Ag later converted the value added program into two loans to Shaull. Fin–Ag took

---

**3.** Fin–Ag's cattle were marked with either its brand or its ear tags. 82 of the 910 head of cattle carried either Fin–Ag's brand or ear tag at the final count.

perfected security interests in the cattle in June 1997 and July 1998.

[¶ 35.] Sometime in 2001, Shaull approached Fin–Ag about expanding the cattle operation to include feeder cattle. Fin–Ag did not want to loan Shaull any additional money but did agree that, if he refinanced the brood cows with American, he could use the loan proceeds to buy the feeder cattle. Thus, in June 2001, Fin–Ag subordinated its perfected security interest in Shaull's breeder cattle to American.

### AgStar's Interest

[¶ 36.] AgStar's interest is contingent upon Feldman's interest. AgStar is Feldman's lender and holds a security agreement in all livestock owned or later acquired by Feldman.

### Feldman's Interest

[¶ 37.] Feldman's claim is grounded upon its ownership interest in the cattle it placed with Shaull for feeding and care pursuant to a bred cow agreement dated November 30, 2000.

[¶ 38.] Feldman placed cattle with Shaull on a number of occasions:

- November 28, 2000: 122 bred cows purchased by Feldman from H.S. Cattle.
- December 7, 2000: 290 bred cows purchased by Feldman from Haas Livestock and delivered to Shaull.
- December 6–7, 2000: 38 bred cows delivered to Shaull by Feldman from their feedlot in Prior Lake, Minnesota.
- December 6–7, 2000: 91 bred cows purchased by Feldman from Haas Livestock which were delivered to Shaull from St. Onge, South Dakota.
- March 15, 2001: 370 bred cows purchased by Feldman from H.S. Cattle which included approximately 150 head of bred cows Shaull had contemporaneously purchased from Sampson's, approximately 190 cows Shaull

had contemporaneously purchased from Ogle Brothers and approximately 36 head of bred cows Shaull contemporaneously purchased from Greg Clement.

- December 15, 2001: 625 bred cows Feldman purchased from H.S. Cattle which were the Jennings cattle.

[¶ 39.] The bred cow agreement was entered into by the parties on November 30, 2000 and was to cover a period of two years. According to the agreement, Feldman was to place 500 to 1300 bred cows with Shaull. Shaull would be paid by Feldman for the cost of feedlot feed and the cost to rent pasturage which costs were preset in the agreement. Feldman would be paid eleven percent interest on the cost of the cattle and feed. After the first year of the contract, Shaull was to provide bulls to impregnate the herd. Calves were to be sold by November 1, 2001 and November 1, 2002.

[¶ 40.] The agreement also provided that:

On or before December 1, 2001 and December 1, 2002, cows will be pregnancy checked, opens will be sold. We have the option on the pregnant cows to either sell them or keep them or add to them until next year.

Finally, the agreement provided that the parties were to split the profits or losses equally on the date of final settlement which was to be on or before December 15, 2002.

[¶ 41.] With this factual background, the issues presented in this case can be stated as follows:

Whether the trial court erred when it concluded that Shaull had rights in the cow herd and all calves born from that herd sufficient to allow American and Fin–Ag's security interests to attach to the animals.

Whether the trial court erred when it concluded that Feldman and AgStar were estopped from making any claim that their interests in the animals were first and superior to those of American and Fin–Ag.

Whether the trial court erred when it concluded the cattle were farm products rather than inventory.

## STANDARDS OF REVIEW

[¶ 42.] A trial court's findings of fact are reviewed under the clearly erroneous standard. *A.P. & Sons Const. v. Johnson,* 2003 SD 13, ¶ 9, 657 N.W.2d 292, 294. A finding is clearly erroneous if, after reviewing the entire evidence, we are left with a definite and firm conviction that a mistake has been made. *Id.* The conclusions of law of the trial court are reviewed under the de novo standard. *Id.* Under the de novo standard we do not give deference to the trial court's conclusions. *Id.*

## ANALYSIS

### ISSUE ONE

[¶ 43.] **Whether the trial court erred when it concluded that Shaull had rights in the cow herd and all calves born from that herd sufficient to allow American and Fin–Ag's security interests to attach to the animals.**

[¶ 44.] In *Continental Grain Co. v. Brandenburg,* 1998 SD 118, ¶ 16, 587 N.W.2d 196, 200, this Court determined that:

SDCL 57A–9–203(1) provides three requirements that must be met before a security interest will attach and be enforceable against a debtor or third party:

> (a) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ...; and
>
> (b) Value has been given; and
>
> (c) *The debtor has rights in the collateral.*

(emphasis original).

At issue here is whether Shaull had rights in the collateral sufficient for American and Fin–Ag's security interests to attach and also the extent of such interests.

[¶ 45.] Although the phrase "rights in the collateral" is not defined in the Uniform Commercial Code (SDCL ch. 57A),

> [The] language merely states a truism, namely, that the debtor normally can only convey something once it has something, and that something may be less than the full bundle of rights that one may hold in such property. The "rights in the collateral" language is a gateway through which one looks to other law to determine the extent of the debtor's rights, and thus the interest the debtor can grant to a third party by way of a security interest.

4 James J. White Robert S. Summers, Uniform Commercial Code 31–6 (4th ed. 1995).[4]

4. In *First Nat. Bank of Philip v. Temple,* 2002 SD 36, ¶ 23, 642 N.W.2d 197, 204, we expounded on the concept of "rights in the collateral."

The common conceptualization of property rights as consisting of a bundle of sticks is helpful in understanding when a debtor has sufficient rights in an asset to grant an enforceable Article 9 security interest. Full ownership of an asset includes, *inter alia,* the rights to possess and use the asset. All or some of the owner's rights can be transferred by way of sale, lease, or license. A person with transferable rights can grant an enforceable security interest in those rights. In the full ownership situations, the security interest attaches to the full panoply of rights, ... debtor with only limited rights in an asset can convey no more than the extent of its own interest. The limitations on

[¶ 46.] In looking to other law, we have used both legal and equitable concepts to determine the extent of a debtor's rights in collateral. *Continental Grain,* 1998 SD 118 at ¶ 21, 587 N.W.2d at 202; SDCL 57A–1–103. One such concept is the doctrine of estoppel.

> Although it is not always determinative on the issues of attachment and priority, the doctrine of estoppel may defeat competing claims when owners fail to protect themselves and allow others to retain control over collateral. SDCL 57A–1–103 permits legal and equitable concepts to supplement the provisions of the UCC.

*Continental Grain,* 1998 SD 118 at ¶ 21, 587 N.W.2d at 202. *See also Pleasant View Farms, Inc.,* 455 N.W.2d at 604.

[¶ 47.] Feldman, AgStar and Amicus argue that the bred cow agreement created a voluntary bailment relationship and, therefore, Shaull obtained no rights in the collateral to which the security interests of American and Fin–Ag could attach. They cite *Rohweder v. Aberdeen Production Credit Ass'n,* 765 F.2d 109, 113 (8th Cir. 1985) for the proposition that, if parties intend to create a bailment with the owner retaining complete ownership of the cows and relinquishing only possession, the feeder does not have sufficient rights for attachment of a creditor's lien.[5] On the other hand, American and Fin–Ag cite us to a line of cases holding that a debtor acquires rights in collateral sufficient to estop the owner from claiming ownership against an innocent third party when the owner imbues the debtor with evidence of ownership and control and does not file a UCC–1 financing statement. In *Proceedings for Dep. In Court of Monies,* 417 N.W.2d 187, 188 (S.D.1987), we quoted with approval the following language from *Brown,* 622 F.Supp. at 1049–1050:

> Even if the plaintiff had established ownership of the cattle, the court is unconvinced that a third party's ownership interest in collateral bears any substantial weight in determining a debtor's "rights in collateral" for the purposes of attachment of a security interest. The official comment to § 9–202 states unequivocally that "[t]he rights and duties of parties to a security transaction and of third parties are stated in this Article without reference to the location of 'title' to the collateral." Even if a party retains ownership interest in a piece of collateral, a debtor who retains that collateral is still able to mislead potential creditors by exercising his "rights" of possession and control over the collater-

---

the debtor's rights also constitute limitations on the interest taken by the secured party and on the interest that can be conveyed to a foreclosure-sale buyer.... A secured party's rights expand as additional parties with rights in the collateral consent to have their rights encumbered.... Even a person who has not actually consented to a security interest may be estopped to deny its effectiveness.... Estoppel can result from either a common-law rule or a statute and is inevitably based on the estopped person's actions in clothing the debtor with indicia of ownership. *Id.* (quoting William H. Lawrence et al., *Understanding Secured Transactions* 88–90 (2000)).

5. *Brown v. United States,* 622 F.Supp. 1047, 1049 (D.S.D.1985) provides a good definition of a voluntary bailment.

> [A] bailment constitutes the delivery of personal property to another in trust for a specific purpose with an express or implied contract that the trust be faithfully executed and the property returned or accounted for when that purpose is accomplished or kept until reclaimed by the bailor.

*Id.* (citing *Johnson v. Hanna,* 78 S.D. 324, 101 N.W.2d 830, 835 (1960)). *See also* SDCL ch. 43–39, Deposit of Personal Property.

al. It is the outward appearance of a *debtor's* rights of ownership and control in the collateral that determines whether attachment of a security interest is effective and not the rights of a party who may have title to the collateral. (emphasis in original).

*See also First Nat. Bank in Pierre, S.D. v. Feeney,* 393 N.W.2d 458, 460 (S.D.1986).

[¶ 48.] The trial court concluded that "Shaull had rights in the cow herd and all calves born from that herd sufficient to allow a security interest to attach to the animals." This conclusion was premised, in part, on the express terms of the bred cow agreement.

[¶ 49.] I agree with the trial court that, as a matter of law, Shaull did have an interest in the herd under the terms of the bred cow agreement. Reading the document as a whole, as we must, it is clear that, although Feldman was to buy the cows, *both* parties had rights in and to the calves and their proceeds. Feldman was obligated to pay Shaull fifty percent of the net proceeds from the sale of calves or to share equally in any loss resulting from such sale.[6] Net proceeds were arrived at by deducting the fixed costs of feed and pasture per cow paid to Shaull, the variable veterinary costs and the eleven percent interest Feldman was to receive based on

what it spent on the cost of the cows and the feedlot and pasture costs. Although some portions of this agreement suggest a bailment, it was much broader in scope. It created a joint venture relationship between the parties because each was to share equally in the profits or losses and because Shaull was obligated to provide the bulls to breed the cows after the first year. This agreement is also distinguishable from a bailment because it provided that Feldman was to receive an eleven percent return on its investment. This gave the agreement the complexion of a creditor/debtor relationship between Feldman and Shaull.

[¶ 50.] Recognizing that the bred cow agreement expressly gave Shaull an interest in the calves sufficient for attachment of a security interest, the next question is whether Shaull also had a tangential interest in the cows. Since Shaull had an interest in the calf crop, it follows that he also had an equitable interest in each of the pregnant cows, albeit not a legal or ownership interest. However, ownership is not the critical factor as "[o]ur cases demonstrate that *control* over the collateral, rather than record ownership, is the key factor in determining a debtor's rights in collateral." *First Nat. Bank,* 532 N.W.2d at 63 (emphasis added).[7]

---

6. The provisions of the bred cow agreement that are of particular importance are the final three:

Calves will be sold by November 1, 2001 and November 1, 2002.

On or before December 1, 2001, and December 1, 2002, cows will be pregnancy checked, opens will be sold. *We* have the option on the pregnant cow to either sell them or keep them or add to them until next year.

This agreement will be settled by December 15, 2002 with profits or losses split equally between the parties. (emphasis added).

Feldman did admit at trial that the "We" used in the second to the last paragraph meant both itself and Nathan Shaull.

7. As early as 1933, long before the adoption of our Uniform Commercial Code, we recognized that even though the financier for a car dealership reserved title to the vehicles in its own name, it could be estopped by its conduct from disputing the existence of title in an innocent third person.

It is a general rule applicable to personal property that no one can transfer or confer a better title than he has unless some principle of estoppel operates to bar a claim under an otherwise better title. The mere possession of chattels, by whatever means acquired, if there is no other evidence of property rights therein or authority to sell given by or for the true owner, will not

[¶ 51.] The trial court never did assess the extent of Shaull's interest in the cattle under the agreement since it also held that Feldman and AgStar were estopped from making any claim that their interests in the animals were first and superior to those of American. In light of my proposed disposition on issues two and three, I would remand to the trial court the question of the extent of Shaull's interest under the agreement.

## ISSUE TWO

[¶ 52.] **Whether the trial court erred when it concluded that Feldman and AgStar were estopped from making any claim that their interests in the animals were first and superior to those of American and Fin–Ag.**

[¶ 53.] As already stated, a person can acquire rights in collateral by one of two ways; by express agreement of the parties or by actions of the owner cloaking a bailee or another with indicia of ownership such that the equitable principle of estoppel by negligence estops the true owner from making a claim. Estoppel by negligence is "[a]n estoppel arising when a negligent person induces someone to believe certain facts, and then the other person reasonably and detrimentally relies on that belief." Black's Law Dictionary 571 (7th ed. 1999). Estoppel by negligence must be distinguished from equitable estoppel which requires an element of deception or gross negligence amounting to constructive fraud. *See Kahler, Inc. v. Weiss,* 539 N.W.2d 86, 91 (S.D.1995). Other than in secured transaction cases, we have recognized the concept of estoppel by negligence in the law of agency concerning the authority of an agent to act for a principal.[8]

---

enable the possessor to give a good title.... "It is equally well settled that, if personal property is delivered, under a conditional sale contract, to a buyer who is engaged in the business of selling property of the same kind, and, with the knowledge of the seller, is placed on display for sale with such other property, the holder of the reserved title is estopped to assert it against a bona fide subvendee for value.... In such a case the rights of the innocent subvendee 'do not depend upon the actual title or authority of the party with whom he deals directly, but are derived from the act of the real owner, which precludes him from disputing, as against the innocent party, the existence of the title or power which, through negligence or mistaken confidence, he has caused or allowed to be vested in the party making the sale.'"
*Iowa Guarantee Mortgage Corp. v. General Motors Acceptance Corp.,* 62 S.D. 18, 21, 250 N.W. 669, 670 (1933) (quoting *Pacific Finance Corp. v. Hendley,* 103 Cal. App. 335, 284 P. 736, 737; 285 P. 1048).

8. As set forth in *Federal Land Bank of Omaha v. Sullivan,* 430 N.W.2d 700, 701 (S.D.1988):
In the law of agency, a principal will be liable for contracts made in its behalf by an agent if the agent was *authorized* (emphasis original) to enter into the agreements. *Mueller v. Union Pacific,* 220 Neb. 742, 371 N.W.2d 732 (1985); 3 C.J.S. Agency § 408. This authority may be actual or ostensible. Actual authority is created by manifestations from the principal to the agent, SDCL 59–3–2, while ostensible authority is created when the principal allows a third person to believe the agent has authority to act on the principal's behalf. SDCL 59–3–3. *Strictly speaking, ostensible agency is no agency at all; it is in reality based entirely on an estoppel. Chleboun v. Varilek,* 81 S.D. 421, 136 N.W.2d 348 (1965); *Hartford Accident & I. [Imdemnity] Co. v. Bear Butte Valley Bank,* 63 S.D. 262, 257 N.W. 642 (1934). "[W]here it appears that the principal knew, or by a proper supervision of the affairs of the agency ought to have known, of the acts of the agent, or the general course and manner in which he was conducting the business of the agency, he is estopped as against innocent third persons from denying the power of the agent to act." Hartford Accident & I. [Imdemnity] Co., 63 S.D. at 267, 257 N.W. at 645. If the agent had ostensible authority, the principal is bound by the acts of his agent "to those persons only who have in good faith, and without negligence, incurred a liability or parted

American's $498,413.50 loan to Shaull

[¶ 54.] The trial court found that, by the terms of the bred cow agreement and the actions of the parties, Shaull had actual physical control and possession of the cattle. The court also found that the "cows were in Shaull's possession, control and apparent ownership at the time [American] inspected the cow herd in June 2001 and were represented by Shaull as being owned by him." While Feldman and AgStar dispute the finding of apparent ownership I am satisfied from the record that Feldman cloaked Shaull with sufficient indicia of ownership to mislead an innocent third party into believing that Shaull was the actual owner and was capable of granting a security interest in the cattle. Clearly Shaull had physical possession of the cattle, was responsible for leasing their pasture, decided if and when the cattle were to be moved and decided whether veterinarian work was to be done. Moreover, Shaull's employees cared for the cattle and took their orders from Shaull. Finally, although Feldman would consult periodically with Shaull's hired man, no other person associated with the care or keeping of the cattle in South Dakota had any idea that Feldman had any interest in the cattle.

[¶ 55.] The trial court found that, on or about June 8, 2001, American made a $498,413.50 loan to Shaull and that Shaull gave American a security interest in the cattle. The court also found that, at the time American took its security interest, it "had neither actual nor constructive knowledge of any claim of ownership by Feldman or any security interest claimed by AgStar" and that it "took all steps reasonably necessary to determine that its perfected security interest would attach to the cow herd." Feldman and AgStar argue that these findings are clearly erroneous.

They contend that American failed to take reasonable measures to ensure that Shaull had an interest in the cattle and that it also failed to act reasonably when it did extend credit to Shaull by paying his checking overdrafts.

[¶ 56.] An element of estoppel by negligence is reasonable reliance on the part of the innocent party. In this case, that requires proof that American acted in a reasonable manner when it took its security interest and extended credit. A creditor "cannot prevail on an estoppel theory without showing facts demonstrating both reliance and lack of knowledge of the true facts or means to discover them." *Estate of Harris v. Harris*, 218 F.3d 1140, 1152–53 (10th Cir.2000).

[¶ 57.] To verify Shaull's representation in his loan application that he owned the cattle, American took the following steps: its bankers were accompanied by Shaull in conducting a physical inspection of the cattle in their pastures; it obtained Shaull's last income tax return to ensure that the cattle were on a depreciation schedule; it reviewed Shaull's two most recent financial statements; it confirmed with Fin–Ag the existence of the cattle; and, it did a comprehensive lien search, obtaining releases or subordinations of all liens of record. Furthermore, the only evidence before the trial court on the issue of American's efforts to verify Shaull's ownership was from American's witnesses who testified that American followed standard banking practices and procedures in making the loan.

[¶ 58.] I am satisfied that this record supports the trial court's findings that American took reasonable measures to verify Shaull's ownership claim. Although American could have taken some of the

with value upon the faith thereof." SDCL 59–6–3. (emphasis added).

additional measures suggested by AgStar such as an inspection of every animal or requiring Shaull to produce some proof of purchase, it must be remembered that this was a refinancing of an existing herd, not a purchase money financing. American acted as a reasonable lender would have under the same or similar circumstances and, thus, I would affirm that part of the trial court's judgment determining that Feldman and AgStar should be estopped from claiming that their interests in the 910 head of cattle are first and superior to the interest resulting from American's $498,413.50 loan to Shaull.

### Fin–Ag's loan

[¶ 59.] The trial court concluded that Fin–Ag had a perfected security interest in the cattle, subject only to American's interest. I agree with this conclusion to the extent that it recognizes the interest acquired by Fin–Ag through the bred cow agreement and the after-acquired property clause of its 1999 security agreement.[9] I disagree, however, with any conclusion that Feldman and AgStar should be estopped from claiming their share since the bred cow agreement was not entered into by Feldman and Shaull until November 30, 2000. The trial court never entered any findings of fact on this issue and there is simply no evidence in the record that Fin–Ag ever detrimentally relied upon the conduct of Feldman and AgStar in extending credit to Shaull after November 30, 2000. Therefore, I would reverse that part of the trial court's judgment holding that Feldman and AgStar are estopped from claiming their interests are first and superior to that of Fin–Ag.

### American's $750,000 loan to Shaull

[¶ 60.] There remains the question of whether Feldman and AgStar should be estopped from claiming their share in the cattle because of the $750,000 debt due to American on the September 27, 1999 revolving line of credit account. This account was established specifically to cover overdraft checks drawn on Shaull's sale barn account. Of the $750,000, approximately $635,782 was extended over a two day period on April 11 and 12, 2002. Feldman and AgStar contend that it was unreasonable for American to extend this credit. I would not reach this issue since the trial court never addressed whether American detrimentally relied upon the appearance of ownership of the Feldman/Shaull cattle when it extended the credit to the sale barn operation. Thus, I would reverse and remand that part of the trial court's judgment determining that Feldman and AgStar should be estopped from claiming that their interests in the 910 head of cattle are first and superior to the interests resulting from American's $750,000 loan to Shaull. With the remand I would instruct the trial court to consider whether American detrimentally relied upon the appearance of ownership and, if so, to then balance the equities between the parties considering that estoppel is an equitable remedy.

### ISSUE THREE

[¶ 61.] **Whether the trial court erred when it concluded the cattle were farm products rather than inventory.**

[¶ 62.] The final issue concerns the trial court's conclusion of law that *"[a]ny sales of cattle from the cow herd from Shaull to Feldman were sales of farm products by a farmer and, as such, the perfected security interests of [American] and Fin–Ag attached to any cattle pur-

---

9. Under the most favorable interpretation, Fin–Ag's interest would not be any more than one-half the herd.

chased by Feldman from Shaull." (emphasis added). The result of this conclusion is that American and Fin–Ag would have a one hundred percent interest in any cattle Shaull sold to Feldman by reason of the after-acquired property clauses of the multiple security agreements.[10] The trial court erred in reaching this conclusion.[11]

[¶ 63.] Shaull wore a number of different hats. He owned and operated a sale barn, he ran a cattle brokerage business, he ran cattle of his own, and he also managed the bred cow operation for Feldman. These were very distinct and different roles.

[¶ 64.] The issue is whether the cattle Shaull sold to Feldman were inventory of the cattle brokerage business or farm products of Shaull's personal cattle operation. If they were inventory, a buyer in the ordinary course of business would take them free of any security interest. If they were farm products, the buyer would take them subject to any security interest. SDCL 57A–9–320 (a).

> Under the Uniform Commercial Code, goods are classified as consumer goods, equipment, farm products, or inventory. Livestock used or produced in farming operations and in the possession of a debtor engaged in raising, fattening, grazing, or other farming operations are farm products. If goods are farm products they are neither equipment nor inventory. § 9–109(3), UCC.
>
> Goods which are held for sale or lease are classified as inventory. § 9–109(4), UCC. The Comment to section 9–109, UCC, states that the classifications are mutually exclusive and that the principal

test to determine whether goods are inventory is whether they are held for immediate or ultimate sale. In borderline cases the principal use to which the property is put should be considered determinative.

*First State Bank v. Producers Livestock Marketing,* 200 Neb. 12, 261 N.W.2d 854, 858 (1978).

[¶ 65.] In Finding of Fact # 45 the trial court found:

> The cows which are the subject of this action are brood cows and were intended to be held for an extended period of time for calf production. The calves were intended to be raised and ultimately sold. Both the cows and calves are farm products and not inventory.

This finding is a correct statement to the extent that it recognizes that the joint venture bred cow operation of Feldman and Shaull did hold the cattle for breeding purposes and, ergo, they were farm products of that business venture. It does not necessarily support a conclusion that they were farm products of Shaull's personal cattle breeding operation.

[¶ 66.] In Finding of Fact # 49 the trial court found:

> Shaull maintained and cared for the cow herd as a farmer and not as an order buyer. Any purchase of cattle by Feldman from the cow herd maintained by Shaull was a purchase of farm products from a farmer and not from a sale barn operator or order buyer.

Again this finding is correct to the extent that it recognizes how the cattle were held by the Feldman/Shaull business venture.

---

**10.** Pursuant to the bred cow agreement, Feldman placed 1,536 head of cattle with Shaull. Of this number, Feldman purchased 1,117 head from Shaull. The trial court never did determine which of the 910 head Feldman purchased from Shaull and which were already owned by Feldman and delivered to Shaull.

**11.** However, this does not affect the results reached under the bred cow agreement and under the principles of estoppel.

It is, however, clearly erroneous in respect to all of the cattle sold by Shaull to Feldman and then cared for by Shaull in that on March 15, 2001, Feldman purchased from H.S. Cattle 370 head of bred cows which H.S. Cattle purchased on that same date from three sources. These cattle were never held by Shaull in his personal cattle operation for breeding purposes. Rather, these cattle were held by Shaull for resale and were clearly inventory.

[¶ 67.] There were two other sales of cattle from Shaull to Feldman during the life of the bred cow agreement. The first sale was November 28, 2000 when Feldman purchased 122 bred cows from H.S. Cattle. Because the trial court did not trace the ownership history of the 910 head of cattle present at the time of the count, it is impossible to determine, with the exception of the 82 head bearing the Fin–Ag brand or ear tag, which of the 910 head were purchased by Feldman from Shaull and which of them were procured by Feldman from other sources.

[¶ 68.] As to the 82 Fin–Ag cows the trial court found in Finding of Fact # 16:

Fin–Ag loan officers inspected the cow herd on a regular basis, and noted that the cow numbers were intact on each occasion. The last such inspection was conducted in May 2001.

[¶ 69.] And in Finding of Fact # 51 it found:

At the time the South Dakota Brand Inspectors conducted a brand inspection in June 2002, approximately 82 cows carrying F/A brands or ear tags were present. Those cows were some of the same cows which had been previously inspected by Fin–Ag and AB&T.

Based on these findings, which are not clearly erroneous, it is apparent that the 82 were part of the cow herd placed with Shaull by Fin–Ag in the mid 1990s under the value added program and later pur-

chased by him from Fin–Ag. These cattle were held by Shaull in his own name for the purposes of breeding and were clearly farm products if and when they were sold to Feldman.

[¶ 70.] The third sale was December 15, 2001 when Feldman purchased 625 bred cows, known as the Jennings cattle, from H.S. Cattle. Shaull held these cattle for approximately nine months under a lease with an option to purchase and he exercised the option immediately upon Feldman's commitment to buy them. The lease and American and Fin–Ag's security interests in the lease ended on the exercise of the purchase option as those interests would have merged into Shaull's ownership interest. Since Shaull did not own the cattle at the time he conducted his farming operation with them and since these cattle were purchased for immediate resale, they were clearly inventory at the time of their sale to Feldman. Therefore, the trial court erred in concluding as a matter of law that the "Jennings" cattle were farm products of Shaull at the time of their sale to Feldman.

[¶ 71.] With the exception of the 82 Fin–Ag cows and possibly the balance of the 122 head from the November 28, 2000 sale, the trial court's conclusion of law is not supported by the findings of fact and the record and, thus, I would reverse and remand for further consideration of the 122 November 28, 2000 cattle.

DISPOSITION

[¶ 72.] I would affirm that part of the trial court's judgment holding that American and Fin–Ag jointly hold a security interest in a portion of the herd because of the bred cow agreement. However, I would remand this issue for the trial court to determine the extent of those interests. I would affirm that part of the trial court's

judgment holding that Feldman and AgStar are estopped from claiming any interest in the herd with respect to American's June 8, 2001 loan to Shaull. I would reverse that part of the trial court's judgment determining that Feldman and AgStar should be estopped from claiming their respective ownership and security interests against Fin–Ag. I would reverse and remand that part of the trial court's judgment determining that Feldman and AgStar should be estopped from claiming their respective ownership and security interests against American's September 27, 1999 revolving line of credit account. Finally, I would reverse and remand that part of the trial court's judgment determining that all of the cattle Shaull sold to Feldman were held by Shaull as farm products rather than inventory.