2005 SD 19

**JERKE CONSTRUCTION, INC.,**
**Plaintiff and Appellee,**

v.

**HOME FEDERAL SAVINGS BANK,**
**Defendant and Appellant,**

and

**Matt Peck and Tank Testing, Inc., Defendants.**

**No. 23028.**

Supreme Court of South Dakota.

Considered on Briefs June 1, 2004.

Decided Feb. 9, 2005.

Michael B. Thompson, Sioux Falls, South Dakota, Attorney for plaintiff and appellee.

Rick Entwistle of Woods, Fuller, Shultz & Smith, Sioux Falls, South Dakota, Attorneys for defendant and appellant.

TICE, Circuit Judge.

[¶ 1.] Home Federal Savings Bank, Inc. (Bank) appeals from an order entered against it in a declaratory judgment action initiated by Jerke Construction Corporation (Jerke). Jerke sought to establish its ownership of a bulldozer it had placed in the possession of Justin Peck (Peck), who in turn had offered the machine as collateral to Bank as security for a loan. Having concluded that no security interest attached to the machinery and that Jerke owned the bulldozer, the trial court ordered that Jerke was entitled to possession of the equipment. We affirm that order.

## FACTUAL AND PROCEDURAL BACKGROUND

[¶ 2.] On December 4, 1995, Peck entered into a written agreement with Sweetman Corporation (Sweetman) to purchase a D–9 Caterpiller bulldozer (D–9) from Sweetman for $20,000. On December 12, 1995, Jerke provided a $6,000 check to Sweetman as a down payment on the D–9. On February 22, 1996, Jerke paid Diesel Machinery, Inc. $12,238.17 to fix the transmission on the D–9. On March 13, 1996, Jerke issued a check to Sweetman in the amount of $14,000 as the final payment on the D–9. Sweetman thereupon issued a bill of sale to Jerke for the D–9. In the spring of 1996, the D–9 was delivered to Peck. The D–9 remained in his possession from the time of the repair of the transmission until March 17, 1999, when Jerke physically took possession of the D–9.

[¶ 3.] Peck testified that the monies paid by Jerke were a loan to him in order that he might purchase the D–9. He further testified that it was agreed that he would reimburse Jerke by using the D–9 on Jerke jobs. This was referred to by Peck as a bartering agreement. Though Peck testified that he had completely reimbursed Jerke for the cost of the D–9, the records indicate that, at most, credit could be given by Jerke for somewhere between $14,000 and $18,000 for the work done by Peck. This was testified to by Peck.

[¶ 4.] Bank produced no evidence that Peck submitted billings or documents to Jerke indicating that his work with the D–9 was done to offset a financial obligation he owed to Jerke. The total amount paid out by Jerke for the D–9 and its repairs prior to delivery to Peck was $32,238.17. There was no written financing agreement in existence, nor was there any evidence presented as to what the terms of such an agreement might have been. No evidence at the trial established interest rates, methods of repayment, or a timeline for repayment of the alleged loan. No records suggested that Peck had an ownership interest in the D–9 other than the original purchase agreement between Peck and Sweetman.

[¶ 5.] Evidence clearly indicated that some work on behalf of Jerke was done with the D–9 under Peck's supervision. The value of that work was considerably less, however, than the $32,238.17 that the D–9 originally cost Jerke. While Peck testified that he had used the D–9 for non-Jerke projects during his three year possession, he provided no details regarding those projects.

[¶ 6.] Peck was aware that Jerke received a bill of sale from Sweetman upon the final $14,000 payment. There was no evidence that he sought to obtain a bill of sale from Jerke for himself. Peck never claimed any income tax benefit for depreciation on the D–9 nor did he give any other indication in tax documents that the D–9 was his. He was aware of the fact that

Jerke was declaring the D-9 as its property and was depreciating the D-9 for income tax purposes.

[¶ 7.] On March 9, 1999, Peck obtained a $400,000 loan from Bank secured by his assets. His list of assets included the D-9. At the time of the agreement with Bank, the D-9 was on Peck's property. The only time the D-9 was observed by anyone connected with Bank was in December 1998. Bank never sought to obtain any evidence of ownership, such as a bill of sale, other than accepting the listing submitted by Peck at the time of the issuance of the loan. There was no evidence that Bank had any knowledge whatsoever of the original purchase of the D-9, nor of the use of the D-9 at any time. Bank did a UCC search of Peck's property which was referred to at some points as a title search. In the course of the UCC search, no liens against the D-9 were found that named Peck as the owner. The only evidence Bank had of the D-9's existence was the one observation in December 1998 and Peck's listing of it in his application for the loan obtained on March 9, 1999. On March 17, 1999, Jerke's employees serviced the D-9 on Peck's property and then proceeded to remove it to Jerke's property without Peck's permission.

[¶ 8.] Subsequent to a court trial, the court found, among other things, that Jerke had merely given Peck naked possession of the D-9, and that he did not possess sufficient rights in the collateral to which a security interest could attach. Further, the court found that, contrary to Bank's argument, Jerke was not estopped from challenging the validity of the security interest. On appeal, Bank argues that Peck owned the D-9 pursuant to the purchase agreement with Sweetman and a financing agreement with Jerke. Thus, it argues that Peck had sufficient rights in the collateral for a security interest to attach. Moreover, Bank argues that Jerke allowed Peck to appear to be the owner of the D-9 and should, therefore, be estopped from disputing the validity of the security interest.

Standard of Review

[¶ 9.] Our standard of review is well established:

We review the circuit court's findings of fact under the clearly erroneous standard. Under this standard, we will only reverse when we "are left with a definite and firm conviction that a mistake has been made" after a thorough review of the evidence. We review conclusions of law under the de novo standard without reference to the circuit court.

*American Bank & Trust v. Shaull*, 2004 SD 40, ¶ 11, 678 N.W.2d 779, 783 (quoting *In re Estate of Watson*, 2003 SD 142, ¶ 9, 673 N.W.2d 60, 62).

## ANALYSIS

### ISSUE ONE

[¶ 10.] **Whether Peck had rights in the collateral.**

[¶ 11.] This case first requires us to examine the trial court's determination of whether Peck possessed rights in the collateral to which Bank could attach a security interest. We have previously noted that under SDCL 57A-9-203: "To claim a valid, perfected security interest in collateral, the security interest must attach to the collateral. A security interest attaches when (1) there is an agreement that it attach; (2) value has been given by the secured party; and (3) the debtor has rights in the collateral." *First Nat. Bank of Philip v. Temple*, 2002 SD 36, ¶ 22, 642 N.W.2d 197, 204.

[¶ 12.] The phrase "rights in the collateral" describes the range of transferable interests that a debtor may

possess in property. For example, such rights may be as comprehensive as full ownership of property with legal title or as limited as a license. *See id.* at ¶ 23, 642 N.W.2d at 204. "Essentially, the debtor normally can only convey something once it has something and that something may be less than the full bundle of rights that one may hold in such property." *Id.* at ¶ 24, 642 N.W.2d at 204–205. Formal title is not required for a debtor to have rights in collateral. *Id.* An equitable interest can suffice. *See In re Gelking,* 754 F.2d 778, 781 (8th Cir.1985)(debtor possessed rights in collateral because he had equitable interest in airplane, even though he had not recorded his ownership interest). On the other hand, mere naked possession does not create "rights in the collateral." *Temple,* 2002 SD 36 at ¶ 24, 642 N.W.2d at 204.

[¶ 13.] Against this background, this Court first addresses a key finding of fact, namely that Peck only had naked possession of the D–9.[1] As already mentioned, naked possession cannot support a finding of rights in collateral. Hence, if the trial court's finding on this question is correct, its conclusion that no security interest could attach to the D–9 must be upheld.

[¶ 14.] The record supports the finding that Peck only had naked possession of the D–9. As between Jerke and Peck, Peck's conduct consistently established an intent not to claim direct ownership of the D–9. Though he maintained possession of it from the effective date of purchase until removal after the security agreement was entered into, he did nothing else to establish or indicate a belief that he was the owner of the D–9. He never sought to have Jerke provide him with a bill of sale or other indicia of ownership, he never sought to confirm a financing agreement of any kind with Jerke and he never claimed depreciation on the D–9 for income tax purposes. In addition, he never came close to paying the entire cost of the original acquisition of the D–9. Though he did on occasion use it for his personal interest, it appears to have been used more substantially for Jerke's benefit. Also, Peck never provided notice of any kind to Jerke of the set-off he claimed for the work he performed with the D–9 until a document for the purpose of this case was prepared in January 1999.

[¶ 15.] In addition to these facts, Bank failed to prove that Peck possessed a contractual right to the D–9. Despite the existence of the document identifying Sweetman and Peck as the parties to the agreement for Peck's purchase of the machine, Jerke subsequently wrote the check, received the bill of sale and claimed depreciation expenses on the equipment. This provided a prima facie showing that, notwithstanding the preliminary contractual document, Jerke became the owner of the D–9. Once that showing was made, the burden shifted to Bank to show that, by means of a financing agreement or otherwise, Peck possessed rights in the collateral. *See Rohweder v. Aberdeen Production Credit Assoc.,* 765 F.2d 109, 113 (8th Cir. 1985)(once owner made prima facie showing of ownership of cattle, burden shifted to creditor to demonstrate that the debtor possessed sufficient rights in cattle for security interest to attach). Bank failed to meet the burden of showing that Peck had rights in the collateral.

---

1. The trial court also included the finding of naked possession as a conclusion of law. As we discuss later in this opinion, determinations appropriately characterized as findings of fact will be treated as such on appeal, regardless of the trial court's characterization.

[¶ 16.] The evidence demonstrated that Peck abandoned the preliminary contract with Sweetman. Bank failed to prove the terms of any sort of financing agreement between Peck and Jerke, including the exact amount of money involved, the interest rate and the time and terms of repayment. *See Owens v. Moyes,* 530 N.W.2d 663, 665 (S.D.1995)(finding no loan contract existed where there was no understanding as to these terms) (quoting *Werner v. Norwest Bank,* 499 N.W.2d 138 (S.D.1993)). Since the evidence regarding the alleged agreement was too vague to show that Peck possessed any contractual right in the D–9, that evidence was necessarily too vague to show that he had rights in the collateral to which a security interest could attach.

[¶ 17.] Based upon the foregoing, the trial court did not err in concluding that no security interest attached to the D–9 as Peck had only naked possession and nothing more.

### ISSUE TWO

[¶ 18.] **Whether Jerke should have been estopped from disputing the validity of the security interest.**

[¶ 19.] Bank also argues that Jerke should have been estopped from disputing the existence of a valid security interest in the D–9. Generally, if an owner of property effectively allows a debtor to appear as the owner of that property, and that appearance misleads a creditor, the owner may be estopped to deny the effectiveness of a security interest taken on the property by the creditor. *See Temple,* 2002 SD 36 at ¶ 23, 642 N.W.2d at 204. As we have previously stated,

If the owner of collateral allows another to appear as the owner or to dispose of the collateral, such that a third party is led into dealing with the apparent owner as though he were the actual owner, then the owner will be estopped from asserting that the apparent owner did not have rights in the collateral.

*Shaull,* 2004 SD 40 at ¶ 16, 678 N.W.2d at 784 (quoting *Pleasant View Farms, Inc. v. Ness,* 455 N.W.2d 602, 604 (S.D.1990)). In that regard, "control rather than ownership of collateral determines a debtor's rights to collateral." *Id.*

[¶ 20.] Estoppel may not apply, however, if the allegedly misled creditor failed to make reasonable efforts to ascertain the ownership of the collateral. For example, in *First National Bank of Omaha v. Pleasant Hollow Farm,* 532 N.W.2d 60, 64 (S.D.1995), the court determined that estoppel prevented a party from disputing a bank's security interest. The court noted in its decision that there was no showing that the bank "could have reasonably discovered" that a party other than the debtor possessed an interest in the property. *Id. See also Rohweder,* 765 F.2d at 113 (in general, the party asserting an estoppel must be without convenient access to knowledge contrary to the facts on which he relied).

[¶ 21.] The trial court determined in its conclusions of law that Jerke "did not allow Peck to appear as the owner of the [D–9] such [as] to mislead Home Federal." The court also found that the bank representative had witnessed the D–9 sitting idly on Peck's land, but that no evidence indicated that Bank had knowledge of Peck's operation of the D–9 on Jerke jobs. In addition, the court found that Bank's belief that Peck owned the D–9 was based primarily on Peck's word. Moreover, in the trial court's memorandum opinion, which was incorporated in the findings and conclusions, the court noted that "a more thorough investigation would have put Home Federal on notice of Jerke's claim to

the [D–9]." Consequently, the court concluded that estoppel was inapplicable.

[¶ 22.] Though this is denominated as a conclusion regarding the appearance of ownership, it is more properly characterized as a finding of fact. "This court has held that a fact found by the court although expressed as a conclusion of law will be treated on appeal as a finding of fact." *Johnson v. Petroleum Carriers, Inc.,* 90 S.D. 295, 297, 240 N.W.2d 114, 115 (1976).

[¶ 23.] The record supports the finding that Jerke did not allow Peck to appear as the owner. Bank unconvincingly asserts, in effect, that it was misled by the conduct of Jerke in leaving the D–9 with Peck for three years. Bank failed, however, to show anything more than its observation of the D–9 on Peck's property three months before the loan was made, and that a UCC search discovered no liens on the machine. Under the circumstances of this case, the mere presence of the machinery on the property did not alone establish an estoppel.

[¶ 24.] This conclusion does not depart from our holding in *Shaull, supra* where a person who placed cattle on a debtor's property was estopped from challenging the security interest in the livestock taken by a bank. While the debtor showed the bank representative the cattle on rough terra in rented or owned by the debtor, the decision does not explicitly discuss whether the representative witnessed any acts of control over the livestock. *See id.,* 2004 SD 40 at ¶¶ 12–15, 678 N.W.2d at 783–84. However, the presence of livestock on one's property, particularly in remote terrain, tends to imply the property owner's active feeding, care and upkeep of the animals or a degree of *control* reinforcing the appearance of ownership of the livestock. By contrast, such implications do not necessarily result from the mere presence of an idle piece of machinery on a debtor's property.

[¶ 25.] An equally important distinction between this case and *Shaull* is that the bank in *Shaull* made the effort to review the debtor's tax return. *See id.,* 2004 SD 40 at ¶ 13, 678 N.W.2d at 784. By contrast, the trial court here found that Bank's investigation was inadequate and the record fails to indicate that Bank requested any physical evidence, such as an invoice, bill of sale, purchase agreement, or a tax return, to confirm or refute Peck's claims of ownership of the D–9. Moreover, Bank observed the D–9 only once on Peck's property. Under these circumstances, the UCC search did not suffice to show reasonable efforts to investigate Peck's claims of ownership. *See In re Hunt's Pier Associates,* 143 B.R. 36, 46 (1992)(true owner of carnival rides was not estopped from challenging validity of bank's security interest when bank failed to ask for bill of sale from debtor who pledged rides as security, and where bank merely performed a UCC lien search).

[¶ 26.] The evidence supports the trial court's finding that Jerke did not cause Peck to appear as the owner of the D–9. Therefore, the court did not err in concluding that estoppel did not apply.

[¶ 27.] Affirmed.

[¶ 28.] GILBERTSON, Chief Justice, KONENKAMP and MEIERHENRY, Justices, concur.

[¶ 29.] ZINTER, Justice, concurs with writing.

[¶ 30.] TICE, Circuit Judge, for SABERS, Justice, disqualified.

ZINTER, Justice (concurring).

[¶ 31.] I concur and write to emphasize the vast degree of factual dispute in this case. A review of the entire record re-

flects that the testimony concerning purchase and ownership of the equipment was in total conflict. The testimony concerning estoppel was also hopelessly clouded by factual disputes concerning the physical location and use of the equipment after it left Sweetman. Even the physical evidence was so conflicting that it could have sustained findings in support of either party: Peck possessed the contract to purchase the equipment from Sweetman, while Jerke possessed the bill of sale from Sweetman. Under these circumstances, this appellate opinion cannot adequately replicate all of the facts in favor of each party's theories. For all of these reasons, this case cannot provide meaningful precedent for future cases. In the end, the case involves nothing more than deciding which witness to believe. Because the trial court made that credibility determination after listening to the witnesses testify, we are in no position to second-guess its finding.