#29340, #29354-a-PJD
**2021 S.D. 53**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

FIRST DAKOTA NATIONAL BANK,  Plaintiff and Appellant,

v.

ARTHUR L. GREGG and
JERILYN L. GREGG,  Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
MCCOOK COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHRIS GILES
Judge

* * * *

SHEILA S. WOODWARD
STEVEN K. HUFF
NICHOLAS G. MOSER of
Marlow, Woodward & Huff, Prof. LLC
Yankton, South Dakota                  Attorneys for plaintiff and
                                       appellant.


VINCE M. ROCHE of
Davenport, Evans, Hurwitz & Smith, LLP
Sioux Falls, South Dakota              Attorneys for defendants and
                                       appellees.

* * * *

CONSIDERED ON BRIEFS
JANUARY 11, 2021
OPINION FILED **09/15/21**

DEVANEY, Justice

[¶1.]        Arthur and Jerilyn Gregg entered into an oral agreement with their son-in-law, Tyler McGregor, whereby Tyler would feed the Greggs' cattle to finish in return for payment based on the weight gained by the cattle while in Tyler's care. Tyler did not inform his lender, First Dakota National Bank (First Dakota), that the Gregg cattle were in his possession. Instead, Tyler represented to the bank that the cattle were his. When Tyler's fraudulent conduct was uncovered, a dispute arose over whether First Dakota's security interest in Tyler's collateral attached to the Greggs' cattle. After a court trial, the circuit court determined that the Greggs were not estopped from asserting that Tyler had no rights in their cattle, and therefore, First Dakota did not have a security interest in the Greggs' cattle. We affirm.

## Factual and Procedural Background

[¶2.]        Tyler and Rebecca McGregor operated a cattle feedlot in McCook County, South Dakota, and First Dakota has been their lender since approximately 2006. This case concerns the years 2015 and 2016. At that time, Jeremy Grady was the bank officer primarily responsible for the McGregors' financial relationship with First Dakota. He testified that First Dakota utilized a type of financing for the McGregors called "floor-plan financing" for the purchase of cattle. Under this type of lending program, First Dakota would loan the McGregors money annually on a line of credit evidenced by a single promissory note as opposed to separate notes for each group of cattle purchased by the McGregors. When Tyler wanted to purchase a group of cattle, he would inform First Dakota and First Dakota would advance Tyler money from the line of credit. Grady further testified that to renew their loan

each year, the McGregors were required to provide loan presentations to the bank in which the McGregors represented the collateral they owned and the financial outlook of their business.

[¶3.]     Grady also testified about the McGregors' cattle operation. He explained that Tyler had in prior years engaged in a business of custom feeding cattle for third parties, but according to Grady, Tyler decided to cease his custom feeding operation beginning in 2015 so he could buy, feed, and sell his own cattle. Grady testified that Tyler purchased his first group of cattle in 2014. In the fall of 2015, Tyler sought to purchase a group of cattle designated as Group 21. Tyler told Grady that the Group 21 cattle would be black feeder cattle. First Dakota financed the purchase of Group 21 prior to seeing the cattle and honored nine checks written by Tyler over three months with the notation "Group 21" on the memo line of each check.

[¶4.]     Unbeknownst to First Dakota, Tyler did not completely cease custom feeding for third parties. In November 2015, he agreed to feed 289 head of cattle owned by his in-laws, Arthur and Jerilyn Gregg, who were getting older and were looking to slow down their cattle operation.[1] They raised exclusively Simmental cattle, a distinctive breed identifiable by its larger frame, larger ears, and uniquely shaped head. The Gregg cattle were branded with the Greggs' exclusive brand and had orange ear tags. According to the Greggs, they entered into an oral agreement

---

1.     Although Tyler did not inform First Dakota that he agreed to custom feed the Greggs' cattle in November 2015, First Dakota was aware that Tyler had an arrangement with the Greggs in the spring and summer of 2015 in which the Greggs brought cattle to the McGregor feedlot for custom calving.

whereby Tyler would feed the cattle to finish, and in return, the Greggs would pay him $0.70 per pound of weight gained during their time at the McGregor feedlot. Prior to delivering the cattle to Tyler, the Greggs informed their lender, Dakota Prairie Bank, of their plan to place their cattle with a third party for feeding, and on November 28, 2015, the Greggs transported their cattle to the McGregor feedlot. Dakota Prairie never advised the Greggs to file a livestock caretaker UCC financing statement with the Secretary of State. *See* SDCL 57A-9-505 (statute related to the filing of financing statements by bailors, consignors, lessors, etc.).

[¶5.]    In December 2015, First Dakota conducted an inspection of the McGregors' cattle operation. During the inspection, Tyler did not inform First Dakota that he was custom feeding the Gregg cattle or that some of the cattle present in his feedlot belonged to the Greggs. Rather, he misled First Dakota into believing he and his wife owned the cattle and specifically included the Gregg cattle in Group 21 on his monthly inventory reports to the bank. As a result of Tyler's fraudulent conduct, First Dakota counted the Gregg cattle in its December 2015 inspection.

[¶6.]    In February 2016, the McGregors submitted their annual loan documentation and requested additional financing to restructure their existing debt and to fund the purchase of additional land. At the time, First Dakota believed the McGregors owned approximately 1,800 head of cattle. All the requests under the operating loan were cross-collateralized; thus, the previously purchased Group 21 cattle continued to be listed as collateral on the 2016 operating loan. Prior to approving the McGregors' 2016 financing request, First Dakota performed a UCC

search on January 19, 2016, and found that no other party had filed a caretaking or other UCC filing against the McGregors' cattle. Ultimately, First Dakota decided to renew the McGregors' operating loan, and on February 19, 2016, it advanced the McGregors $954,453 in new money.

[¶7.] On April 7, 2016, Grady performed an inspection of the McGregor property and noticed that the number of cattle in one pen appeared inadequate. He then performed a spot count of the cattle in this pen, which ended up approximately 140 head short. Grady ordered a pen-by-pen count to be conducted the next day; however, prior to Grady's return on April 8, Tyler called him and admitted he did not own as many cattle as he had represented. Tyler later explained to Grady that he had dispersed Group 21 cattle in multiple pens in order to make other groups appear larger for First Dakota's inspections, and that he had falsified reports to the bank.

[¶8.] On April 8, Grady and a fellow First Dakota credit officer, Wayne Williamson, returned to the McGregor property to conduct a further inspection. During the inspection, First Dakota discovered a huge discrepancy between its head count and the 1,860 head of cattle reported to First Dakota in the McGregors' April 1, 2016 inventory report. In particular, First Dakota counted 855 head of cattle at the McGregor feedlot, and of those, the McGregors owned only approximately 285 head. Tyler told Grady that the cattle with orange ear tags belonged to the Greggs.

[¶9.] After its inspection, First Dakota did not let the Greggs take their cattle from the McGregor feedlot. The Greggs retained counsel, and on May 4, 2016, the McGregors, First Dakota, the Greggs, and Dakota Prairie (the Greggs'

lender) entered into a settlement agreement for the disposition of the Gregg cattle. Relevant here, the agreement provided that the Greggs would be permitted to retake possession of their cattle and that if any indebtedness remained after First Dakota liquidated the McGregors' assets, First Dakota would have the right to bring suit against the Greggs and Dakota Prairie to determine First Dakota's interest in these cattle.

[¶10.]     In December 2017, First Dakota filed this declaratory judgment action against the Greggs and Dakota Prairie seeking a judgment against them for the value of the cattle returned to the Greggs. First Dakota asserted that the Greggs' title, right, and interest in these cattle was subject to First Dakota's priority lien. First Dakota further claimed that it had an equitable interest in the cattle because of the McGregors' apparent ownership of the cattle, First Dakota's exercise of reasonable and appropriate care when attempting to ascertain the number of cattle located at the McGregor feedlot, and the failure of either the Greggs or Dakota Prairie to file a UCC caretaker statement or otherwise give notice to First Dakota.[2]

[¶11.]     The Greggs answered and moved for summary judgment, asserting that the undisputed facts established that First Dakota's security interest did not attach to the Gregg cattle because the relationship between Tyler and the Greggs was a mere bailment and naked possession by a debtor is insufficient to allow a security interest to attach. After a hearing, the court denied summary judgment,

---

2.     Dakota Prairie was later dismissed from the suit by stipulation of the parties. The stipulation does not relate the terms of the parties' agreement.

indicating that although many facts were undisputed, there were material facts in dispute related to the conduct of the parties.

[¶12.]     A trial to the court was held on January 15 and 16, 2020.  Multiple witnesses from First Dakota testified, including Grady and Williamson.  The court also heard testimony from Arthur and Jerilyn Gregg.  Neither Tyler nor Rebecca McGregor testified.  Following the trial, the parties submitted briefs summarizing the evidence presented and the pertinent legal questions.  Thereafter, the circuit court issued a memorandum decision, which it incorporated in its findings of fact and conclusions of law.

[¶13.]     The court noted that "First Dakota's claim in this case depends on establishing that the Greggs are estopped from asserting McGregor did not have rights in the collateral[.]"  The court then applied this Court's decisions in *American Bank & Trust v. Shaull*, 2004 S.D. 40, 678 N.W.2d 779, and *Jerke Construction, Inc. v. Home Federal Savings Bank*, 2005 S.D. 19, 693 N.W.2d 59.  The court first determined whether the Greggs allowed the McGregors to appear as the owners of their cattle such that First Dakota was led into dealing with the McGregors as if they were owners.  The court then considered whether First Dakota could have reasonably discovered that the cattle were in fact owned by the Greggs.

[¶14.]     On the first inquiry, the court determined that the Greggs allowed the McGregors to appear as the owners of the cattle because neither the Greggs nor their lender took any action to protect their interests in the cattle.  The court further determined that the McGregors' appearance as the owners of the Gregg cattle led First Dakota to advance $954,453 in new money in February 2016.

However, the court concluded, on the second inquiry, that First Dakota's estoppel claim failed because "First Dakota could have done a more thorough inspection of the McGregor feedlot, required McGregor to provide First Dakota with some kind of proof of purchase other than McGregor's word, and been more diligent in looking at the brands and ear tags of the 'Group 21 cattle' which would have alerted First Dakota to numerous red flags about whether McGregor actually owned the cattle." As such, the court held that the Greggs were not estopped from asserting that the McGregors had no rights in the Greggs' cattle, and therefore, First Dakota could not claim a security interest in them. First Dakota appeals, asserting the circuit court erred in concluding that estoppel did not apply.

## Analysis and Decision

[¶15.] First Dakota acknowledges that its security interest in the McGregors' collateral did not formally attach to the Gregg cattle under SDCL 57A-9-203 because the McGregors did not have "rights in the collateral" to which First Dakota's security interest could attach.[3] *See Jerke*, 2005 S.D. 19, ¶ 12, 693 N.W.2d

---

3.    SDCL 57A-9-203 provides in relevant part that:

> (b) Except as otherwise provided in subsections (c) through (i), a security interest is enforceable against the debtor and third parties with respect to the collateral only if:
> (1) Value has been given;
> (2) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
> (3) One of the following conditions is met:
> (A) The debtor has authenticated a security agreement that provides a description of the collateral . . . ;
> (B) The collateral is not a certificated security and is in the possession of the secured party under § 57A-9-313 pursuant to the debtor's security agreement;
> (continued . . .)

at 62–63 (providing that "[t]he phrase 'rights in the collateral' describes the range of transferable interests that a debtor may possess in property"). Rather, the Greggs had a mere bailment arrangement with the McGregors in which they delivered their cattle to the McGregor feedlot solely for the purpose of the McGregors feeding them in exchange for a weight-gain-based payment, up to the time the Greggs decided to sell the cattle.[4]  As we stated in *Pleasant View Farms, Inc. v. Ness*, "the security interest of a bailee's creditor does not attach to goods which are the subject of a bailment."[5]  455 N.W.2d at 604 (citation omitted).  We have also emphasized

---

(. . . continued)

> (C) The collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under § 57A-8-301 pursuant to the debtor's security agreement; or
> (D) The collateral is deposit accounts, electronic chattel paper, investment property, letter-of-credit rights, or electronic documents, and the secured party has control under § 57A-9-104, 57A-9-105, 57A-9-106, 57A-9-107, or 57A-7-106 pursuant to the debtor's security agreement.
> . . . .

4.    In other cases involving disputes over alleged security interests in cattle, we have previously found sufficient rights in the collateral where owners placed their cattle in the care of another in exchange for a share of the calf crop, and where the debtor caring for the cattle made all the decisions relative to the care of the cattle, including when they would be sold. *See, e.g.*, *Pleasant View Farms, Inc. v. Ness*, 455 N.W.2d 602, 603 (S.D. 1990) (debtor was to receive entire calf crop); *First Nat'l Bank of Phillip v. Temple*, 2002 S.D. 36, ¶ 25, 642 N.W.2d 197, 205 (debtor "made all decisions relative to culling, selling and care of the livestock").

5.    "A bailment is generally defined as 'the delivery of a thing to another for a special object or purpose, on a contract, express or implied, to conform to the objects or purposes of the delivery which may be as various as the transactions of men.'" *Rensch v. Riddle's Diamonds of Rapid City, Inc.*, 393 N.W.2d 269, 272 (S.D. 1986) (citation omitted).

that "mere naked possession does not create 'rights in the collateral.'" *Jerke*, 2005

S.D. 19, ¶ 12, 693 N.W.2d at 63 (citation omitted).

[¶16.] First Dakota, therefore, relies on the alternative basis on which this

Court has upheld the attachment of a creditor's security interest, i.e., when the

debtor's "necessary rights, otherwise non-existent, [are] created by means of

estoppel." *See Ness*, 455 N.W.2d at 604. As this Court has previously explained:

> If the owner of collateral allows another to appear as the owner
> or to dispose of the collateral, such that a third party is led into
> dealing with the apparent owner as though he were the actual
> owner, then the owner will be estopped from asserting that the
> apparent owner did not have rights in the collateral.

*Id.*; *accord Jerke*, 2005 S.D. 19, ¶ 19, 693 N.W.2d at 64; *Shaull*, 2004 S.D. 40, ¶ 16,

678 N.W.2d at 784. However, even if a creditor is misled, an estoppel claim will fail

if the creditor did not make reasonable efforts to ascertain ownership of the

collateral or "'could have reasonably discovered' that a party other than the debtor

possessed an interest in the property." *Jerke*, 2005 S.D. 19, ¶ 20, 693 N.W.2d at 64

(quoting *First Nat'l Bank of Omaha v. Pleasant Hollow Farm, Inc.*, 532 N.W.2d 60,

64 (S.D. 1995)).

[¶17.] On appeal, First Dakota asserts that the Greggs could have easily put

First Dakota on notice that the McGregors did not own the Greggs' cattle by filing a

UCC caretaker statement with the Secretary of State or by informing First Dakota

of their feeding arrangement with Tyler. It therefore contends that the Greggs, by

their actions, "enabled McGregor to perpetrate the fraud that resulted in losses to

both Greggs and First Dakota." First Dakota further asserts that it acted

reasonably in ascertaining the ownership of the McGregors' collateral because it

inspected the McGregors' operation twice a year, required monthly inventory reports, and prior to loaning additional money in February 2016, it ran a UCC search and required signed balance sheets from the McGregors.

[¶18.]       In response and by notice of review, the Greggs disagree that their actions led First Dakota into dealing with the McGregors as if they were the owners of the Gregg cattle. They acknowledge that they delivered the cattle to the McGregor feedlot and did not file a UCC caretaker statement. But they contend that First Dakota is, in effect, asking "this Court to create a new bright-line rule that, absent a UCC filing by the true owner of the property, the property belongs to the creditor who holds a blanket lien on the operation of the person in possession of the property."

[¶19.]       In our prior cases examining whether an owner is estopped from asserting that the apparent owner does not have rights in the collateral, we have not specifically identified the applicable standard of review. In both *Shaull*, 2004 S.D. 40, ¶ 11, 678 N.W.2d at 783 and *Jerke*, 2005 S.D. 19, ¶ 9, 693 N.W.2d at 62, we quoted the law governing the clearly erroneous standard of review and applied that standard in reviewing the propriety of the circuit court's findings of fact in each case. However, it appears that we treated the circuit court's ultimate determination that estoppel did or did not apply as a conclusion of law.[6] *See, e.g., Jerke*, 2005 S.D.

---

6.       In *Jerke*, the Court noted that the circuit court had determined as a conclusion of law that the owner did not allow the debtor to appear as the owner such that the creditor was misled. 2005 S.D. 19, ¶ 21, 693 N.W.2d at 64. The Court then explained that "[t]hough this is denominated as a conclusion regarding the appearance of ownership, it is more properly characterized as a finding of fact." *Id.* ¶ 22, 693 N.W.2d at 65. However, the

(continued . . .)

19, ¶¶ 23–24, 26, 693 N.W.2d at 65 (upholding the court's findings and concluding that the court properly determined estoppel does not apply); *Shaull*, 2004 S.D. 40, ¶ 19, 678 N.W.2d at 785 (concluding that the court's findings supported its determination that estoppel applied). In effect, the scope of review employed by the Court in these cases, while not stated as such, is akin to the review applied in this Court's equitable estoppel cases. *See, e.g.*, *Crouse v. Crouse*, 1996 S.D. 95, ¶ 14, 552 N.W.2d 413, 417 (providing that whether equitable estoppel applies "is fully reviewable as a mixed question of law and fact"); *accord City of Brookings v. Ramsay*, 2007 S.D. 130, ¶ 9, 743 N.W.2d 433, 437 (quoting *Even v. City of Parker*, 1999 S.D. 72, ¶ 9, 597 N.W.2d 670, 674). Therefore, we review the circuit court's factual findings here for clear error and review de novo the determination of whether First Dakota established the legal elements necessary for estoppel.

[¶20.] The circuit court determined, on the first inquiry, that the Greggs allowed the McGregors to appear as the owners of the cattle such that First Dakota was misled into dealing with the McGregors as if they were the owners. The court determined that "the only actions by the Greggs which would have allowed McGregor to appear as the owner of the cattle were the delivery of the cattle to McGregor and the absence of a UCC Caretaker Filing with the Secretary of State." In the court's view, if the Greggs would have filed a caretaking statement, First

---

(. . . continued)

remaining analysis by the Court suggests that it examined the evidence and the circuit court's findings to determine, de novo, whether the court properly concluded that estoppel did not apply, i.e. that the owner did not allow the debtor to appear as the owner such that the creditor was misled. *Id.* ¶¶ 23–26.

Dakota "would have uncovered McGregor's fraud before extending nearly another million dollars in credit." The court likened the lack of a UCC filing and presence of the Gregg cattle at the feedlot to the circumstances at issue in *Shaull*, 2004 S.D. 40, 678 N.W.2d 779. However, the facts here are insufficient as a matter of law to establish the first element necessary for estoppel to apply.

[¶21.]    While it is undisputed that the Greggs did not file a UCC caretaker statement after delivering their cattle to the McGregors, it is well settled that they were not required to do so under the bailment arrangement. *See id.* ¶ 17, 678 N.W.2d at 785 (observing that a bailor is not obligated to file a UCC financing statement). Therefore, the lack of a UCC caretaker statement alone cannot support a determination that the Greggs allowed the McGregors to appear as the owners such that First Dakota was misled. Although the McGregors had possession of the Gregg cattle and were responsible for feeding them to finish, there is no evidence that the McGregors were given any interest in the cattle other than mere possession. The evidence establishes that the Greggs simply delivered their cattle to their son-in-law for the specific purpose of feeding them to finish because the Greggs were getting older and looking to slow down.

[¶22.]    We have recognized that "mere possession of the collateral by the debtor is insufficient to enable a security interest to attach to the collateral." *Pleasant View Farms, Inc.*, 455 N.W.2d at 604. Thus, mere possession is also legally insufficient to give rise to a claim for estoppel. The Greggs did not give the McGregors any ownership interest in the cattle; rather, the Greggs agreed to pay the McGregors $0.70 per pound of weight gained during the time the cattle

remained at the feedlot.  There is also no evidence that the McGregors had any control over the disposition of the cattle; instead, the Greggs decided when their cattle would be sold.  *See Shaull*, 2004 S.D. 40, ¶ 16, 678 N.W.2d at 784 (noting "that *control* rather than ownership of collateral determines a debtor's rights to collateral" (emphasis added)).

[¶23.]     This case is unlike *Shaull*, where additional circumstances existed establishing that the owner of the cattle allowed the debtor to appear as the owner such that a third party could be misled.  *See id.* ¶¶ 12–17, 678 N.W.2d at 784–85. For example, in *Shaull*, the true owner (Feldman) gave the debtor decision-making responsibility related to the cattle, *see id.* ¶ 54, 678 N.W.2d at 792 (Johns, C.C.J., dissenting), and agreed to equally split the net proceeds from the sale of the calves or share equally in any resulting losses after the sale.  *See id.* ¶ 49, 678 N.W.2d at 790 (Johns, C.C.J., dissenting).  Additionally, unlike the Greggs' lender, Feldman's lender asked Feldman for the necessary information to file a UCC statement, but it was never filed.  *Id.* ¶ 17, 678 N.W.2d at 785.  Notably, Arthur Gregg testified that he did not even know who the McGregors' lender was.

[¶24.]     It is also worth noting that, generally, the doctrine of estoppel requires there to be both representations or concealment of material facts and reliance on those representations or concealment to the other party's prejudice or injury.  *See, e.g., Dakota Truck Underwriters v. S.D. Subsequent Injury Fund*, 2004 S.D. 120, ¶ 32, 689 N.W.2d 196, 204 (listing the elements of equitable estoppel).  Here, the Greggs took steps to show outward ownership of the cattle placed with the McGregors for feeding.  In particular, before delivering the cattle to the McGregor

feedlot, they branded them on the left hip with their exclusive brand and uniformly tagged each left ear with separately numbered orange ear tags. Admittedly, a cattle brand is often not definitive as to ownership, but it can be "prima facie evidence of ownership of livestock." *See Temple*, 2002 S.D. 36, ¶ 25, 642 N.W.2d at 205 (citing *Cont'l Grain Co. v. Brandenburg*, 1998 S.D. 118, ¶ 32 n.9, 587 N.W.2d 196, 204 n.9 (citing SDCL 40-19-24)).

[¶25.]     In short, nothing the Greggs did suggested that they were relinquishing control over their cattle. First Dakota's perception that all the cattle in the McGregors' pens were owned by the McGregors was fueled by Tyler's fraudulent actions and misrepresentations, rather than by the conduct of the Greggs. Because the evidence here does not support the circuit court's determination, on the first inquiry, that the Greggs allowed the McGregors to appear as owners of the Gregg cattle such that First Dakota was misled, the court erred in concluding otherwise. However, reversal is unnecessary under the circumstances because the court reached the correct result when it ultimately concluded that First Dakota's estoppel claim fails, albeit under the second inquiry pertaining to whether First Dakota could have reasonably discovered the Greggs' ownership of the cattle prior to advancing the McGregors new money. *See Pfuhl v. Pfuhl*, 2014 S.D. 25, ¶ 7, 846 N.W.2d 778, 780 (noting that a circuit court's judgment can be upheld when the result is correct). Because we have determined the evidence of record does not support the first inquiry necessary to establish an estoppel claim, it is unnecessary for this Court to review the propriety of the circuit court's decision under the second inquiry. We therefore affirm the circuit court's

conclusion that First Dakota could not claim a security interest in the Greggs'

cattle.

[¶26.]     Affirmed.

[¶27.]     JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices,

concur.